# IN THE SUPREME COURT OF IOWA

No. 06–1748

Filed March 19, 2010

**AMY ANN SCHUTJER,**

Appellant,

vs.

**ALGONA MANOR CARE CENTER**
and **IOWA LONG TERM CARE**
**RISK MANAGEMENT ASSOCIATION,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Kossuth County, Joseph J. Straub, Judge.

Employer seeks further review of court of appeals' decision in appeal of workers' compensation case. **DECISION OF COURT OF APPEALS VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED, AND CASE REMANDED.**

Mark S. Soldat of Soldat & Parrish-Sams, P.L.C., West Des Moines, for appellant.

Michael L. Mock of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellees.

**TERNUS, Chief Justice.**

This workers' compensation case comes to us on further review from the court of appeals. The appellee, Algona Manor Care Center, does not dispute that the appellant, Amy Schutjer, sustained an injury to her lower back on December 2, 2002, that arose out of and in the course of her employment with Algona Manor. In fact, Algona Manor paid Schutjer temporary benefits. The parties do, however, disagree with respect to the following matters: (1) the correct rate for benefits, (2) Schutjer's entitlement to additional temporary total and temporary partial disability benefits, (3) Schutjer's entitlement to permanent partial disability benefits, and (4) the propriety of penalty benefits. The workers' compensation commissioner sided with Algona Manor on these issues, agreeing with Algona Manor's calculation of the rate and awarding no additional benefits.

On Schutjer's appeal to the district court, the court determined the employer had incorrectly calculated the rate, and the commissioner had improperly refused to award temporary benefits for certain days between December 2, 2002, and January 4, 2003. The district court affirmed the commissioner's decision with respect to a denial of temporary benefits after January 4, 2003, finding substantial evidence to support the commissioner's determination that Schutjer voluntarily quit her employment on January 5. The district court also affirmed the commissioner's refusal to award permanent partial disability benefits. Finally, the court concluded that, in view of the court's reversal as to the correct rate, the commissioner should reconsider whether penalty benefits should be imposed.

Both parties appealed, and the case was transferred to the court of appeals. That court affirmed the district court with respect to the proper rate and the need for reconsideration of penalty benefits. As for temporary benefits, the court of appeals agreed with the district court that Schutjer was

entitled to temporary benefits for certain days between December 2, 2002, and January 4, 2003. The court of appeals disagreed with the district court on two issues. The court of appeals concluded that the commissioner had not properly analyzed the question of Schutjer's entitlement to temporary benefits after she left employment on January 5, and that the commissioner had failed to provide adequate detail in his decision to support his conclusion that Schutjer had no permanent disability. Therefore, the court of appeals reversed the denial of temporary benefits after January 5, 2003, and the denial of permanent partial disability benefits.

Algona Manor sought further review. We granted further review to consider whether the commissioner properly determined Schutjer was not entitled to temporary benefits after January 4, 2003, and whether the commissioner adequately detailed his reasons for finding Schutjer had not sustained a permanent disability. *See Anderson v. State*, 692 N.W.2d 360, 363 (Iowa 2005) ("On further review, we can review any or all of the issues raised on appeal or limit our review to just those issues brought to our attention by the application for further review.").[1] We find no basis for reversal with respect to either matter. Therefore, we vacate that part of the court of appeals' decision reversing the district court on these two issues. We affirm the district court's decision and remand the case to the district court for further proceedings.

**I. Factual and Procedural Background.**

We limit our recitation of the evidence and history of this case to those facts and rulings that are pertinent to the two issues we have chosen to address on further review.

---

[1]On all other issues raised on appeal, the court of appeals' decision stands as the final ruling. *See Everly v. Knoxville Cmty. Sch. Dist.*, 774 N.W.2d 488, 492 (Iowa 2009).

**A. Injury and Medical Treatment.** At the time of her injury on December 2, 2002, Amy Schutjer worked as a certified nursing assistant (CNA) at Algona Manor Care Center. On that date, she and another CNA were transferring a resident from the resident's bed to a wheelchair. During this maneuver, Schutjer experienced a sharp pain in her left hip area that radiated into her back and down her left leg.

Algona Manor immediately sent Schutjer to the Kossuth Regional Health Center where Schutjer saw a physician's assistant. Schutjer described what had happened and denied any history of prior back problems, even though her medical and employment records from approximately 1991 onward indicate numerous complaints of back pain, including a back injury in 1991 as a result of being thrown from a horse. X-rays of the lumbrosacral spine and left hip taken at the health center were essentially normal. Due to her continued complaints of severe pain, Schutjer was administered a pain medication injection and given a prescription for pain medication. She was also taken off work until December 9, 2002.

On December 9, 2002, Schutjer returned to the health center for a scheduled appointment with Dr. Burt Bottjen. Schutjer reported to Dr. Bottjen that the pain medication had not helped much. After observing and examining the patient, Dr. Bottjen concluded her complaints were exaggerated and inconsistent with the reported injury. He increased her pain medication and advised her to work with her workers' compensation carrier to find another physician, as he would not be able to help her.

The employer authorized care with Dr. Kevin Culbert. Dr. Culbert first saw Schutjer on December 12, 2002. In relaying her medical history, Schutjer again denied any history of back problems. She also provided a somewhat different version of the incident that precipitated her current pain,

stating that during the transfer the resident slipped, jerking Schutjer's back forward in a flexed position. Dr. Culbert diagnosed Schutjer with acute low back pain with left sciatica. He prescribed medication, continued physical therapy, and ordered modified work duties to include no lifting over ten pounds, no bending or twisting, no stooping or crouching, and no pushing or pulling.

The employer constructed and provided Schutjer's supervisors with a list of light-duty activities that would be appropriate for Schutjer to perform within her restrictions. Schutjer returned to work on December 17, 2002.

On December 27, 2002, Schutjer underwent an MRI that showed bulging at L4–5, but no significant encroachment on the spinal canal. Due to Schutjer's continuing pain, Dr. Culbert maintained duty restrictions, continued her pain medication, and ordered a consult with anesthesiology for pain management.

On January 2, 2003, Schutjer received a lumbar epidural steroid injection. That same day, she notified Dr. Culbert that she was not getting much help at work to stay within restrictions and had to do some bending, twisting, and pulling. Dr. Culbert advised Schutjer to speak to the charge nurse or head of human resources about this.

On January 5, 2003, Schutjer reported to work, but a few hours after the shift started, Schutjer and the charge nurse got into a dispute when the nurse requested that Schutjer clean commode buckets, bedpans, and urinals. Schutjer advised the nurse that she could not bend down to clean commodes. According to the charge nurse, when she instructed Schutjer that Schutjer could still clean the urinals, Schutjer became angry, swung her arms around, stating "I'm leaving, I quit," and stormed out the door.

The following day, the nursing supervisor informed the workers' compensation claims adjuster that Schutjer had terminated her employment

with Algona Manor. The claims adjuster informed the supervisor that Schutjer had called the carrier and left a message about the incident in which she claimed she was being asked to do tasks she could not do. The supervisor denied this was the case.

That same day, Schutjer called the supervisor to ask, "What's going on?" Schutjer denied she had quit the night before, claiming the charge nurse had asked her to leave. The supervisor countered, however, that it was her understanding the charge nurse had asked Schutjer to leave only after Schutjer had twice refused to follow the charge nurse's request to clean urinals. Upon reconfirmation of the facts with the charge nurse, the supervisor advised Schutjer that Algona Manor was accepting her "I quit" as her termination. Schutjer did not return to Algona Manor to work after this incident.

Schutjer continued to see Dr. Culbert for her low back pain. Having been advised by Schutjer that she had obtained no relief with the epidural injection, Dr. Culbert referred her to Dr. Palit, an orthopedic surgeon.

On January 22, 2003, Dr. Palit saw Schutjer for the first time. After examining her and reviewing the prior MRI, Dr. Palit's diagnosis was "mild lumbar degenerative disc disease" for which he ordered physical therapy and allowed light-duty work with a twenty-pound lifting restriction and no bending, twisting, kneeling, or crawling. However, like Dr. Bottjen, Dr. Palit found "[t]he patient's pain complaints and manifestation . . . out of proportion to her physical and radiographic findings." He was also surprised by her report that, the night before, she had experienced an acute onset of total paralysis from the waist down that lasted about an hour. His surprise focused on the fact that Schutjer did not seek medical care because "[s]he knew [she] was going to see [me] the next morning." Dr. Palit found

Schutjer's attitude about this alleged incident to be "very cavalier" "for this apparently devastating experience of total paralysis."

On February 28, 2003, Schutjer returned to see Dr. Palit for ongoing low back pain with bilateral lower extremity pain. Schutjer reported that she had not gone to physical therapy at this point. She had, however, obtained employment in the Hy-Vee floral department and, according to Dr. Palit, reported working up to twelve hours per day. (At the subsequent workers' compensation hearing, Schutjer claimed she only worked a maximum of six hours per shift at Hy-Vee.) After examination, Dr. Palit determined Schutjer had reached maximum medical improvement as of February 28, 2003. He released her to regular duty and directed her to continue taking her anti-inflammatory medication.

Between February 19, 2003, and March 26, 2003, Schutjer also sought care for her back pain with Jensen Chiropractic. On her last three visits for manipulation, March 17, 19, and 26, 2003, Schutjer reported no complaints. At the subsequent workers' compensation hearing, however, Schutjer testified that only her continued treatment with Dr. Jensen made work at the floral department bearable. On March 27, 2003, the claims adjuster for the workers' compensation carrier advised Schutjer that her chiropractic treatment was not authorized and that she either needed to return to Dr. Palit or needed to request alternative medical treatment. Schutjer did not request alternative care.

On April 3, 2003, Schutjer sought treatment from Dr. Arthur Doenecke for her continuing and long-standing problems with anxiety and depression. Dr. Doenecke ordered Prozac for depression and Ambien for sleep and made a psychiatric referral. He also referred Schutjer to a podiatrist for two ingrown toenails she had asked him to examine. There was no mention in the medical notes that Schutjer reported any continuing

back, hip, or leg problems. Two later doctor visits on April 15 and May 8, 2003, make no reference to any complaints of continuing back, hip, or leg problems. Schutjer also continued her employment with Hy-Vee until April 28, 2003, when she quit because she needed to be involved in seeking a loan for a new home.

At the subsequent workers' compensation hearing, Schutjer testified that she did not seek medical attention for her back and continued to work even though the pain still existed because her husband would not allow her to seek medical attention through his insurance. The testimony of Schutjer's husband corroborated this assertion.

Schutjer's next medical treatment for back pain occurred on June 4, 2003, when she saw Dr. David Taylor. At that time, she complained of some numbness in her left leg with pain sometimes radiating down to her left foot. Schutjer reported to Dr. Taylor that this problem started with the December 2, 2002 incident at Algona Manor. She also reported to Dr. Taylor that her prior MRI showed a bulging disc. Due to her pain and symptomatic examination, Dr. Taylor determined it was necessary to rule out a herniated disc and ordered another MRI and a consultation with a neurosurgeon, Dr. Beck. He did not place Schutjer on any pain medication due to her concerns about chronic use of narcotics. Several days later, however, Schutjer called complaining of continued pain with no relief and was restarted on Darvocet N, which she had at home.

Schutjer's neurosurgery consultation with Dr. Beck occurred on June 16, 2003. Dr. Beck found the patient to be quite histrionic upon physical examination. He read the December MRI as showing a little disc degeneration and minimal bulge at L4–5 and told Schutjer this. Because she claimed her pain was much worse, however, he agreed to proceed with a second MRI.

The second MRI, performed on June 18, 2003, was essentially the same as the first. Nonetheless, because Schutjer continued to complain of severe bilateral leg and back pain, Dr. Beck concluded a discogram was warranted to determine if L4–5 was a symptomatic disc. That test, performed on June 26, 2003, revealed a tear in the annulus posteriorly at L4–5 and some degeneration at L5–S1. Based upon these positive findings, Dr. Beck recommended Schutjer undergo spinal fusion at the level of L4–5. Schutjer underwent the procedure on July 10, 2003.

Although her initial post-op period was uneventful, Schutjer was subsequently hospitalized for three days for back and right leg pain in late August 2003. The pain started two weeks prior after she heard a pop in her back.

In a follow-up visit on September 27, 2003, Dr. Beck found that Schutjer continued to have back pain that severely restricted her activity. He recommended she continue on significant restrictions of minimum sitting, standing, and a twenty-pound weight limit. X-rays showed an excellent fusion, however, and on examination the patient was neurologically intact. In December, upon inquiry, Dr. Beck opined Schutjer had suffered a twelve percent body-as-a-whole impairment.

Dr. Palit, upon the same inquiry, opined that Schutjer reached maximum medical improvement on February 28, 2003, and that she did not require any further medical care other than taking nonsteroidal anti-inflammatory medication. He also opined that the July surgery was not medically necessary based on his evaluation earlier in 2003 and that the surgery was not causally related to her work injury.

As a result of the two conflicting medical expert opinions, Schutjer requested an independent medical examination. On August 23, 2004, this examination was completed by Dr. John Kuhnlein, an occupational and

environmental specialist. Dr. Kuhnlein also concluded Schutjer exhibited histrionic behavior. In response to the question of whether, to a reasonable degree of osteopathic certainty, it was probable that cumulative work activities at Algona Manor, the December 2, 2002 incident, or both, constituted a substantial, but not necessarily exclusive, factor in causing injury to Schutjer's back and leg, Dr. Kuhnlein opined:

> If one discounts her histrionic behaviors and focuses on the objective complaints, it appears that the sensory complaints from December of 2002 were mirrored in June and July of 2003 indicating the same source. However, she had a period of several months where she was apparently pain free. She relates that she was taking pain medications, but in review of the only notes I have available from the medical clinic, she was placed on Prozac for depression, and I do not see any specific indication she was on pain medications until June of 2003.
>
> My sense is that physiologically the two are related, but based on the currently available medical record, and given Worker's Compensation scenario, I cannot objectively make the relationship between the December 2002 injury and the June 2003 pain, given the several month interval where no back pain is mentioned.

**B. Workers' Compensation Proceeding and Judicial Review.** On September 4, 2003, Schutjer filed a workers' compensation claim against Algona Manor and Cannon Cochran Management Services, Inc., administrator for Algona Manor's workers' compensation carrier, Iowa Long Term Care Risk Management Association. (Our subsequent references to Algona Manor include its carrier, where indicated by the context.) A hearing on the matter was held before a deputy workers' compensation commissioner, Helenjean M. Walleser (hereinafter "deputy"). Pertinent to this appeal, the parties disputed, among other issues, (1) whether the December 2, 2002 injury was a cause of permanent disability and, if so, to what extent, and (2) whether Schutjer was entitled to healing period compensation or temporary partial benefits after she left employment on January 5, 2003.

On March 10, 2005, the deputy filed an arbitration decision, finding (1) the December 2, 2002 work injury was not a cause of permanent disability, and (2) Schutjer was not entitled to any healing period or temporary partial benefits beyond those for which Algona Manor had already paid. The deputy's credibility findings were critical to her rulings. She specifically found that Schutjer lacked credibility. Supporting this finding was the evidence admitted at the hearing. Admitted into evidence at the hearing were the medical records showing prior complaints of back pain that Schutjer had denied having when she first sought treatment for her December 2, 2002 injury; the testimony of Schutjer admitting that she had made those prior complaints; the testimony of Schutjer's husband that he did not believe that Schutjer suffered from back pain after the workers' compensation payments stopped, although he had later changed his mind; the testimony of Schutjer admitting that she testified at her deposition that, after leaving work with Algona Manor, she had not filed an unemployment claim that had been denied, although she admitted at the hearing that she had done so; and the testimony of Schutjer that she had committed the felony of theft by check. In addition, as discussed above, many of the expert medical opinions concluded that Schutjer was histrionic in her description of pain, more than one physician finding those complaints to be exaggerated.

Schutjer filed an application for rehearing asserting several errors in the deputy's findings of fact and conclusions of law. Of relevance to the issues we consider, Schutjer contended the deputy erred when the deputy held "[t]he greater weight of the credible evidence would establish that claimant voluntarily quit her employment on January 5, 2003." Instead, Schutjer asserted, the greater weight of the evidence established a withdrawal of an offer of suitable work or a failure to prove an intentional refusal to work. After her application for rehearing was rejected, Schutjer

appealed to the workers' compensation commissioner, who delegated authority to issue the final agency decision to a different deputy commissioner, Larry P. Walshire (hereinafter "commissioner"), who adopted the deputy's proposed decision as the final agency decision.[2] The commissioner specifically noted that he was relying on the credibility findings made by the deputy.

Schutjer filed a petition for judicial review, alleging several errors, including the commissioner's failure to award temporary benefits after January 4, 2003, and failure to award medical expenses and permanent partial disability benefits after February 28, 2003.

The district court concluded there was substantial evidence to support the commissioner's finding that Schutjer did in fact terminate—quit—her employment with Algona Manor on January 5, 2003. As a result, the court held the commissioner properly decided Schutjer was not entitled to compensation for either healing period or temporary disability benefits after that date. The district court also concluded there was substantial evidence to support the commissioner's finding that Schutjer sustained no permanent disability as a result of the December 2, 2002 incident at Algona Manor. Therefore, the court affirmed the denial of healing period benefits and medical expenses for the time period of July through September 2003, as well as the denial of permanent partial disability benefits.

**C. Arguments on Appeal.** Schutjer appealed, and Algona Manor cross-appealed. Only the matters raised by Schutjer on appeal are implicated in the issues we address on further review. Those matters include (1) Schutjer's contention the district court erred in affirming the

---

[2]Because the commissioner adopted the deputy's proposed decision, we will treat both the deputy's proposed decision and the commissioner's final decision as one decision and reference them in the remainder of this opinion as the "commissioner's decision."

commissioner's failure to award healing period or temporary disability benefits after January 4, 2003, on the basis that she had voluntarily quit; and (2) her contention the district court erred in affirming the commissioner's failure to award temporary disability and medical benefits associated with her July 10, 2003 surgery and refusal to award permanent partial disability compensation.

**D. Court of Appeals' Decision.**  We transferred this appeal to the court of appeals.  The court of appeals disagreed with the commissioner and the district court regarding the effect of Schutjer's voluntary quit.  The appellate court concluded that Schutjer's voluntary quit was irrelevant to the issue of whether she was entitled to temporary benefits.  It held that, pursuant to Iowa Code section 85.33(3) (2003), a two-part analysis was necessary:  (1) Was Schutjer offered suitable work within her restrictions? and (2) If so, did she refuse it?  This issue, the court concluded, required remand to the agency for a determination as to whether, on January 5, 2003, suitable work within Schutjer's restrictions was offered to Schutjer and whether she refused such work.

The court of appeals also disagreed with the district court's affirmance of the commissioner's denial of benefits after February 28, 2003.  The court of appeals found the commissioner based his causation ruling solely on its determination that Schutjer lacked credibility.  The court of appeals concluded the agency had a duty to state the evidence relied upon and that the commissioner's decision must be sufficiently detailed to show the path taken through the conflicting expert evidence.  Because the court of appeals thought the commissioner's decision did not meet these requirements, the court of appeals remanded the case, directing the agency to "show the path" taken through the conflicting medical evidence and to discuss the relevant benefits and expenses.

Algona Manor filed an application for further review of all of the rulings of the court of appeals that were adverse to it. Schutjer filed a resistance to that application. As noted above, we granted further review to consider two issues: (1) whether the commissioner properly ruled Schutjer was not entitled to temporary benefits after she left employment on January 5, 2003; and (2) whether the commissioner adequately explained his decision that Schutjer's medical expenses and disability after February 28, 2003, were not causally connected to her December 2, 2002 injury.

## II. Scope of Review.

Our review in a workers' compensation action is governed by Iowa Code chapter 17A. *See* Iowa Code § 86.26 (2009). Because the commissioner's factual determinations are " ' "clearly vested by a provision of law in the discretion of the agency," ' . . . we defer to the commissioner's factual determinations if they are based on 'substantial evidence in the record before the court when that record is viewed as a whole.' " *Larson Mfg. Co. v. Thorson,* 763 N.W.2d 842, 850 (Iowa 2009) (quoting *Mycogen Seeds v. Sands*, 686 N.W.2d 457, 465 (Iowa 2004) and Iowa Code § 17A.19(10)(*f*)). Our assessment of the evidence focuses not on whether the evidence would support a different finding than the finding made by the commissioner, but whether the evidence supports the findings actually made. *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 218 (Iowa 2006). "Because the commissioner is charged with weighing the evidence, we liberally and broadly construe the findings to uphold his decision." *Finch v. Schneider Specialized Carriers, Inc.*, 700 N.W.2d 328, 331 (Iowa 2005). In addition, we give due regard to the commissioner's discretion to accept or reject testimony based on his assessment of witness credibility. *See Terwilliger v. Snap-On Tools Corp.*, 529 N.W.2d 267, 273 (Iowa 1995).

In contrast, the commissioner's interpretation of the law is entitled to no deference because " '[t]he interpretation of the workers' compensation statutes and related case law has not been clearly vested by a provision of law in the discretion of the agency.' " *Lakeside Casino v. Blue*, 743 N.W.2d 169, 173 (Iowa 2007) (quoting *Finch*, 700 N.W.2d at 330). We will reverse the commissioner's application of the law to the facts "only if the commissioner's application [is] 'irrational, illogical or wholly unjustifiable.' " *Larson Mfg. Co.*, 763 N.W.2d at 850 (quoting Iowa Code § 17A.19(10)(*l*)).

### III. Temporary Benefits After Voluntary Quit.

Relying on Iowa Code section 85.33(3), the commissioner ruled Schutjer was barred from receiving benefits as of January 5, 2003, the date that Algona Manor claims she voluntarily quit her employment. In pertinent part, this statute provides:

> If an employee is temporarily, partially disabled and the employer for whom the employee was working at the time of injury offers to the employee suitable work consistent with the employee's disability the employee shall accept the suitable work, and be compensated with temporary partial benefits. If the employee refuses to accept the suitable work with the same employer, the employee shall not be compensated with temporary partial, temporary total, or healing period benefits during the period of the refusal.

Iowa Code § 85.33(3).

In this case, the commissioner made the following factual finding: "The employer was accommodating claimant's modified duty restrictions during [the time after the December 2, 2002 incident.]" In addition, the commissioner stated the evidence established that Schutjer voluntarily quit her employment on January 5, 2003. There is no other discussion in the findings of fact or conclusions of law regarding the incident on January 5, 2003.

In reviewing the commissioner's decision, the district court held " 'the greater weight of the objective credible evidence' indicated [Schutjer] resigned her CNA position with Algona Care on January 5, 2003." The district court then went on to discuss the facts found in the record that supported the commissioner's finding on this issue. It noted the factual discrepancies between the parties with respect to what occurred on January 5. Schutjer asserted she was asked to perform tasks not within her restrictions and denied the allegation by the charge nurse at Algona Manor that she—Schutjer—stormed out of the facility after announcing she had quit. At another point in her testimony, however, Schutjer stated: "That isn't why I quit," an assertion that seems to confirm the nurse's statement that Schutjer quit. In contrast to Schutjer's testimony, Algona Manor witnesses testified Schutjer was excused from performing tasks not within her restrictions—such as cleaning bedpans and commode buckets—and that she was only required to clean urinals, a task within her restrictions.

The district court correctly noted that, when there are two competing accounts of a single event, the commissioner has the responsibility to weigh the evidence and consider the credibility of the witnesses. *See Terwilliger*, 529 N.W.2d at 273. The court concluded substantial evidence supported the finding made by the commissioner.

The court of appeals, however, stated the issue was not whether Schutjer voluntarily quit, but whether Schutjer was offered suitable work within her restrictions and whether she refused it. Only if she was offered such work and refused it would she be precluded from receiving temporary partial, temporary total, or healing period benefits. Concluding the agency failed to clearly address this issue, the court of appeals remanded the case so the commissioner could make this determination.

We agree the correct test is (1) whether the employee was offered suitable work, (2) which the employee refused. If so, benefits cannot be awarded, as provided in section 85.33(3). We conclude, however, that the commissioner found Schutjer was offered suitable work that she refused, and for that reason, Schutjer was not entitled to benefits as specified under section 85.33(3). Although the commissioner's decision is nearly devoid of any discussion of the issue of modified duty and adherence to work restrictions, he expressly found that the employer was accommodating Schutjer's modified duty restrictions during this time. Substantial evidence supported this conclusion. The commissioner's finding that Schutjer voluntarily quit satisfied the second requirement of section 85.33(3)—refusal of suitable work.

Schutjer argues, nonetheless, that any refusal of suitable work ended on January 6, 2003, when she talked to the supervisor and denied that she had quit, asserting the charge nurse had fired her. This factual dispute— whether Schutjer quit or was fired—was resolved against her. Therefore, Algona Manor was justified in accepting Schutjer's voluntary quit on January 5, 2003, as a rejection of suitable work on that date and any future date.

We conclude the findings required by section 85.33(3) were made by the commissioner, and these findings enjoy substantial support in the record. Therefore, we vacate the court of appeals' contrary decision and affirm the decision of the district court on this issue.

## IV. Benefits After Maximum Medical Improvement.

As noted earlier, the court of appeals reversed the district court decision affirming the commissioner's determination that Schutjer was not entitled to benefits after February 28, 2003, the date Dr. Palit concluded she had reached maximum medical improvement. To be entitled to benefits

following this date, Schutjer had to satisfy her burden of proving that her medical treatment subsequent to February 28, as well as any temporary or permanent disability, was causally related to the December 2, 2002 injury.

Schutjer argues the commissioner's finding that her medical problems after February 28, 2003, were not causally related to her December 2002 injury is not supported by substantial evidence. She contends the commissioner failed to explain the basis for his rejection of the evidence supporting a causal connection, particularly the testimony of Dr. Beck. The court of appeals concluded the district court erred in holding that the commissioner found "the opinions of Dr. Palit and Dr. Kuhnlein, along with the testimony of [Schutjer], to support the finding that [Schutjer's] continuing back problems were not caused by the December 2, 2002 incident at Algona Manor." The court of appeals believed the agency based its causation ruling solely on its determination that Schutjer lacked credibility and that the agency failed to explain the weight given to the varied medical opinions or explain how it resolved the conflicts in the medical evidence.

1. *Applicable legal principles.* "A claimant must prove by a preponderance of the evidence that the injury is a proximate cause of the claimed disability." *Grundmeyer v. Weyerhaeuser Co.*, 649 N.W.2d 744, 752 (Iowa 2002). Ordinarily, expert testimony is necessary to establish the causal connection between the injury and the disability for which benefits are claimed. *Id.* With regard to expert testimony,

> "[t]he commissioner must consider [such] testimony together with all other evidence introduced bearing on the causal connection between the injury and the disability. The commissioner, as the fact finder, determines the weight to be given to any expert testimony. Such weight depends on the accuracy of the facts relied upon by the expert and other surrounding circumstances. The commissioner may accept or reject the expert opinion in whole or in part."

*Id.* (quoting *Sherman v. Pella Corp.*, 576 N.W.2d 312, 321 (Iowa 1998) (citations omitted)); *accord Sanchez v. Blue Bird Midwest*, 554 N.W.2d 283, 285 (Iowa Ct. App. 1996) ("Expert opinion testimony, even if uncontroverted, may be accepted or rejected in whole or in part by the trier of fact.").

With respect to the commissioner's written decision, Iowa Code section 17A.16(1) provides: "The [agency] decision shall include an explanation of why the relevant evidence in the record supports each material finding of fact. . . . Each conclusion of law shall be supported by cited authority or by a reasoned opinion." This duty on the part of the agency is intended to allow a reviewing court "to ascertain effectively whether or not the presiding officer actually did seriously consider the evidence contrary to a finding, and exactly why that officer deemed the contrary evidence insufficient to overcome the evidence in the record supporting that finding." Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 42 rptr. cmt. (1998) [hereinafter "Bonfield"]; *accord Catalfo v. Firestone Tire & Rubber Co.*, 213 N.W.2d 506, 510 (Iowa 1973) ("[The commissioner's] decision must be sufficiently detailed to show the path he has taken through conflicting evidence. When he disregards uncontroverted expert medical evidence he must say why he has done so."); *see also Tussing v. George A. Hormel & Co.*, 417 N.W.2d 457, 458 (Iowa 1988) (finding commissioner's failure to state any reasons for rejecting overwhelming evidence, including medical evidence, that work-related injury occurred on date in question required reversal). The requirement that the commissioner explain his decision is not intended to be onerous:

> [T]he commissioner's decision must be "sufficiently detailed to show the path he has taken through conflicting evidence," [but] the law does not require the commissioner to discuss each and every fact in the record and explain why or why not he has

rejected it. Such a requirement would be unnecessary and burdensome.

*Terwilliger,* 529 N.W.2d at 274 (quoting *Catalfo,* 213 N.W.2d at 510); *accord* Bonfield at 42 rptr. cmt. (stating the "requirement of a brief explanation will not be burdensome"); *see also Bridgestone/Firestone v. Accordino,* 561 N.W.2d 60, 62 (Iowa 1997) (stating commissioner's duty to furnish a reasoned opinion is satisfied if " 'it is possible to work backward . . . and to deduce what must have been [the agency's] legal conclusions and [its] findings of fact' " (quoting *Norland v. Iowa Dep't of Job Serv.,* 412 N.W.2d 904, 909 (Iowa 1987))).

2. *Analysis.* The commissioner's opinion does not express the step-by-step reasoning process that led him to the conclusion that Schutjer failed to show the December 2002 injury caused continued disability after February 28, 2003. Nevertheless, we conclude on this specific issue—the connection between the December 2, 2002 injury and the subsequent treatments after February 28, 2003, and resulting impairment—it is possible to determine from the commissioner's opinion what evidence he considered and why he credited some of this evidence over other, conflicting evidence.

As noted by the court of appeals, the agency did summarize the medical opinions contained in the evidence. The commissioner observed that Dr. Palit stated Schutjer had reached maximum medical improvement on February 28, 2003, and Dr. Palit found no permanent impairment. The commissioner noted that Dr. Palit further opined that, based upon his evaluation of Schutjer in January and February 2003, Schutjer's surgery was not causally related to her work injury and was not medically necessary. On the other hand, the commissioner mentioned that Dr. Beck, who initially saw Schutjer in June 2003 and eventually performed a laminectomy on her, opined Schutjer's December 2, 2002 injury was a substantial factor in

causing her back pain and that under the guidelines she had a twelve percent whole body impairment as a result of that injury. Finally, the commissioner discussed the opinion of the independent medical expert, Dr. Kuhnlein. Dr. Kuhnlein, as noted previously, opined that he could not objectively relate Schutjer's December 2, 2002 injury to her June 2003 back pain as Schutjer did not have a "straight record" of symptoms from her December injury to her July surgery. The commissioner also took note of Dr. Kuhnlein's observation that, while Schutjer maintained she had remained on nonsteroidal anti-inflammatory medication after her release from Dr. Palit, the medical records did not support this. In addition to reviewing these medical opinions, the commissioner summarized the various medical providers from whom Schutjer sought care during the period between February 28, 2003, and June of 2003, specifically finding that she did not mention any back or leg symptoms to her primary care physician or her psychiatrist when she saw them on five separate occasions in April and May 2003.

At the end of his review of the medical evidence, the commissioner stated the following conclusion:

> Claimant does not carry her burden of demonstrating that her December 2, 2002 work injury was a substantial factor in precipitating her June 2003 complaints, her July 2003 surgery, and her continuing low back and bilateral leg symptoms. The record clearly demonstrates that claimant has never been averse to seeking medical care. It also clearly demonstrates that claimant tends to complain profusely to her care providers about any medical conditions for which she is seeking care. Given those circumstances, claimant's statements, both to medical providers from June 4, 2003 onward and at hearing, that she had *continuing* low back and leg symptoms from December 2, 2002 lack credibility.

(Emphasis added.) It is apparent from the commissioner's discussion that he believed Schutjer would have complained of back and leg pain between

February 2003 and June 2003 if she had continued to experience such pain during that time. The commissioner had previously noted, however, that the record did not indicate such complaints had been made. Accordingly, the commissioner concluded Schutjer's assertions of continuing symptoms between February and June lacked credibility. This conclusion confirmed Dr. Kuhnlein's opinion that, in the absence of a "straight record" of symptoms from the December 2002 injury to the July 2003 surgery, it could not be said that the December 2002 injury was causally linked to the later surgery and permanent impairment.

Thus, when the commissioner's conclusion that Schutjer's testimony of continuing symptoms was not credible is considered in the context of the commissioner's review of the medical evidence, it is evident that the commissioner chose to rely on the opinions of Dr. Palit and Dr. Kuhnlein because those opinions were more consistent with the factual findings made by the commissioner with respect to the symptoms Schutjer experienced between February and June. Thus, it is possible to identify from the commissioner's causation discussion the evidentiary basis of his conclusion and why he gave preference to the opinion testimony of Dr. Palit and Dr. Kuhnlein.

We conclude, therefore, that the commissioner's decision was sufficiently detailed to permit us to ascertain that he seriously considered the evidence for and against his finding with respect to causation, as well as why he concluded the evidence against causation was more credible. In addition, the commissioner's decision on causation is supported by substantial evidence in the form of the expert opinions of Dr. Palit and Dr. Kuhnlein. Therefore, we vacate the decision of the court of appeals and affirm the decision of the district court affirming the commissioner's ruling

that Schutjer was not entitled to benefits for the medical expenses and disability she sustained after February 28, 2003.

### V. Summary and Disposition.

We conclude the commissioner found Schutjer was offered suitable work, which she refused, and these findings are supported by substantial evidence. Therefore, the commissioner did not err in refusing to award Schujter temporary benefits after she left employment. We also conclude the commissioner adequately explained the basis for his decision that the medical expenses and disability sustained by Schutjer after she reached maximum medical improvement on February 28, 2003, were not causally connected to her December 2, 2002 injury. Because the commissioner's finding on causation is supported by substantial evidence, we affirm the commissioner's decision that Schutjer is not entitled to medical benefits or disability benefits for the period subsequent to February 28, 2003.

**DECISION OF COURT OF APPEALS VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED, AND CASE REMANDED.**

All justices concur except Baker, J., who takes no part.