# IN THE COURT OF APPEALS OF IOWA

No. 14-0030
Filed October 15, 2014

**DANNY HINEGARDNER,**
    Petitioner-Appellant,

**vs.**

**IMON COMMUNICATIONS and
ACUITY,**
    Respondents-Appellees.
_____

Appeal from the Iowa District Court for Linn County, Marsha Bergan, Judge.

Danny Hinegardner appeals the district court's judicial review ruling, which affirmed the workers' compensation commissioner's denial of his petition for workers' compensation benefits. **AFFIRMED.**

David A. O'Brien and Teresa L. Vercande of Willey, O'Brien, L.C., Cedar Rapids, for appellant.

Coreen K. Sweeney and Stephanie L. Marett of Nyemaster Goode, P.C., Des Moines, for appellees.

Considered by Potterfield, P.J., and Tabor and Mullins, JJ.

**MULLINS, J.**

Danny Hinegardner appeals the district court's judicial review ruling, which affirmed the workers' compensation commissioner's denial of his petition for workers' compensation benefits. He contends substantial evidence does not support the agency's credibility determination or its finding regarding medical causation. Because there is substantial evidence to support the findings reached, we affirm.

**I. Background Facts and Proceedings.**

Hinegardner began working for IMON Communications on July 14, 2008. On July 28, 2008, he was attempting to pick up a reel of cable weighing an estimated eighty pounds. Hinegardner bent over at the waist to pick it up, lifted the reel approximately five or six inches, and felt a sharp pain in his back.

Hinegardner reported the incident to his supervisor at approximately 10:00 or 10:30 a.m. that day. He did not complete his shift, but made the 240-mile drive home. The following day, Hinegardner went to the emergency room, complaining of pain in his mid and low back, which radiated into his left buttock. He was given an injection of Toradol and was removed from work.

On July 30, 2008, Hinegardner agreed to a recorded interview with Linda Horn, a workers' compensation insurance adjuster for IMON Communication's insurance carrier. Hinegardner reported he ruptured a disc in his back in 1976 and as a result, had surgery on his lower back. When asked if he had any other treatment for his lower back, Hinegardner replied, "Ah I don't know if I want to answer these questions,—any longer, um what else do you have to ask?" The

interview continued, with Horn asking about any prior workers' compensation claims Hinegardner had filed.

During the interview, Hinegardner denied taking any medication "for any health related condition like high blood pressure, diabetes, thyroid . . . ." He also stated, "I don't have a regular doctor, because I never have anything wrong with me. I lived in Michigan for 20 years and I, when I moved back I just never—ah went to a local doctor." The question regarding his prior treatment for his lower back was never raised again.

Hinegardner claims that shortly after this conversation, he provided Horn with a list of doctors who had treated him since his 1976 surgery. While Horn concedes she did receive an executed medical waiver from Hinegardner, she denies ever receiving a list of treating doctors from him. Instead, Horn claims she located Hinegardner's doctors by searching the internet for medical providers who treated back injuries in the areas Hinegardner had lived and sending those providers medical waivers.

Hinegardner has a lengthy history of treatment for lower-back pain, beginning with his 1976 laminectomy. He received epidural steroid injection treatments for residual disc fragments in his back during the 1980s. From 1987 until 2004, Hinegardner saw Dr. Lamont Okey for low back pain that radiated down his legs, and was diagnosed with sciatica. Hinegardner treated his pain with prescription pain relievers and anti-inflammatory medications, as well as Valium. He continued to do so even though a consultation with the Michigan Pain Institute in January 1998 recommended he detoxify from all narcotic pain

medication. A September 2000 MRI revealed advanced degenerative disc disease at the L5-S1. Hinegardner refused surgery and failed to follow through with recommended diagnostic testing.

During the first half of 2008, Hinegardner continued to seek prescription medication to treat his back pain but failed to complete MRI testing as ordered. However, at his February 2011 deposition, Hinegardner testified that once he stopped working ten-to-twelve-hour days, six days per week in April of 2008, his pain "[g]ot better." When asked if he was "treatment-free and prescription drug-free between April of '08 and July 28 of '08," Hinegardner stated, "I believe so," although he refilled a prescription for Hydrocodone four times in that time frame, including one refill two days before the claimed injury.

On September 5, 2008, Hinegardner began treatment with Dr. Timothy VanFleet at the Orthopedic Center of Illinois. Hinegardner underwent x-rays, an MRI, and a discogram. Dr. VanFleet diagnosed Hinegardner with "Lumbar radiculopathy" and performed a L5-S1 minimally invasive transforaminal lumbar interbody fusion with bone morphogenic protein.

As to the question of causation, Dr. VanFleet testified

> that this was a condition that was a chronic condition prior to picking up of the cable. So he obviously had an exacerbation of his injury. Whether or not that exacerbation was the cause of his injury, I didn't think that it was the cause of the reason for the operation.
> I think the reason that he had the operation was because he had a long-standing history of degenerative disk disease with radicular symptomatology that was going to require surgical intervention at some point. The guy was on medication, he had had previous surgery, he had had previous epidurals.
> That natural history is not such that [if] he goes out and pick[s] something up you're going to need to—I mean, certainly

most people they can have an exacerbation. But in his situation I felt like, after I reviewed all of his records, I felt that it was probably not the sole cause for his injury.

His opinion was based upon Hinegardner's "fairly extensive" and "lengthy" medical history.

Hinegardner was referred to Dr. Robert Gordon for an impairment rating. Dr. Gordon testified that Hinegardner was in need of surgery before July 28, 2008, and that it would be "very difficult" to substantiate that his back injury was aggravated by the incident on July 28 "given that he had continued symptoms throughout." With regard to the question of whether the July 28, 2008 incident caused Hinegardner's condition, Dr. Gordon opined: "To say something was aggravated from a pathological standpoint would really be hypothetical conjecture."

Hinegardner filed a petition with the Iowa Workers' Compensation Commissioner on September 9, 2010. An arbitration hearing was held on July 6, 2011. The deputy workers' compensation commissioner filed a ruling on August 15, 2011, denying Hinegardner's claim because he failed to prove a causal connection between the events of July 28, 2008, and a worsening of his condition.

In the arbitration decision, the deputy made the following findings regarding Hinegardner's credibility:

> This deputy did not find claimant to be an especially credible witness. While the incident in question was not witnessed, it still could have occurred, as immediately reported by claimant on July 28, 2008 to his supervisor, Kirk Hauskins. However, in the recorded statement claimant made to the insurance adjuster, Linda Horn, just two days after the alleged incident occurred, claimant

was minimizing his prior and protracted history of back pain and radiculopathy. He also declined to answer additional questions about his prior back treatment. Claimant even denied having a regular doctor where he lived in Michigan for 20 years, despite the fact he had been treating with Dr. Okey for numerous years. It was Dr. Okey who managed claimant's pain medication. Claimant reported to the insurance adjuster, "I never have anything wrong with me." The statement was misleading at the very least.

Claimant was less than forthcoming about his medical condition when he testified during his deposition. Claimant admitted to seeing Dr. Murray in April 2008 but he denied he was taking any narcotic medication. Additionally, claimant testified he was symptom free when he commenced his employment with the present defendant-employer. Nevertheless, despite being symptom free, claimant filled prescriptions for Hydrocodone on April 30, 2008, June 7, 2008, July 4, 2008, and July 26, 2008. Someone who was purportedly symptom free would hardly need to take prescribed narcotic medication. Claimant's behavior was inconsistent with his deposition testimony.

Claimant was not candid with the insurance adjuster, Dr. VanFleet or with Robert Gordon, M.D., concerning the length and extent of claimant's low back condition. Claimant minimized the prior treatment he had received for his low back pain.

Hinegardner appealed the arbitration ruling. He also filed a motion for sanctions challenging what he alleges are false statements made by IMON Communications in its appeal brief. That motion was denied without a hearing, and Hinegardner's appeal of the motion was denied because it was interlocutory in nature. The appeal of the arbitration ruling was affirmed, and Hinegardner's application for rehearing was denied.

On June 14, 2013, Hinegardner filed a petition for judicial review. The matter was submitted without oral argument. On January 3, 2014, the district court affirmed the commissioner's ruling. Hinegardner appeals.

**II. Scope of Review.**

Our review is governed by Iowa Code chapter 17A (2013). *See Mike Brooks, Inc. v. House*, 843 N.W.2d 885, 888 (Iowa 2014). In reviewing the commissioner's decision, the district court acts in an appellate capacity to correct errors of law. *Id.* On appeal, we apply the standards of chapter 17A to determine whether we reach the same conclusions as the district court. *Id.* at 889. If we do, we affirm; if not, we reverse. *Id.*

The legislature vested the commissioner with the discretion to determine the facts. *Id.* If "substantial evidence in the record before the court when that record is viewed as a whole" supports the commissioner's findings, we are bound by them. Iowa Code section 17A.19(10)(f)(1) defines "substantial evidence" as "the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." It is not enough that different conclusions may be drawn from the evidence. *Mike Brooks*, 843 N.W.2d at 889. Our job is to determine whether substantial evidence supports the findings actually made. *Id.*

**III. Discussion.**

**A. Credibility Determination.**

Hinegardner first challenges the agency's credibility findings. As the trier of fact, the commissioner has a duty to determine witness credibility. *Arndt v. City of Le Claire*, 728 N.W.2d 389, 395 (Iowa 2007). Because such determinations are necessarily based on facts, we apply the substantial-evidence

standard on review. *See Finch v. Schneider Specialized Carriers, Inc.*, 700 N.W.2d 328, 332 (Iowa 2005). "[W]e give due regard to the commissioner's discretion to accept or reject testimony based on his assessment of witness credibility." *Schutjer v. Algona Manor Care Ctr.*, 780 N.W.2d 549, 558 (Iowa 2010).

Hinegardner contends substantial evidence does not support the deputy commissioner's finding that he was not credible. His argument centers on the insurance adjuster's claim she discovered his medical records by sending record requests to medical providers she found when she checked the internet for doctors treating back injuries in the areas Hinegardner had lived. He argues it is "irrational and illogical" to believe that his medical records were discovered this way. Hinegardner claims he provided the names of his treating physicians to Horn, which is how the medical records were discovered. He states: "The Deputy's determination that Hinegardner's medical history and records were the result of an internet search goes against reason and logic."

The only finding the agency made concerning Hinegardner's disclosure of information to the insurance adjuster was that Hinegardner "was not candid . . . concerning the length and extent of [his] low back condition." There is no finding that the insurance company discovered his medical records through an internet search or that Hinegardner never provided the insurance carrier with a list of his treating physicians after the recorded interview. There is no discussion of the matter in the arbitration decision. Rather, the deputy's credibility determination turns on Hinegardner's failure to be forthcoming about his medical condition and

treatment during the initial interview with the insurance adjuster, in his deposition, and when providing information to Drs. Gordon and VanFleet. Viewing the entire record, we conclude substantial evidence supports the finding that Hinegardner's claims regarding the extent of his injury prior to July 28, 2008, are not credible.

Hinegardner also argues the commissioner erred in adopting the deputy's credibility findings because they were not based on the deputy's personal observations at the hearing. In the appeal decision, the commissioner gave the deputy's credibility findings "considerable deference," noting that the deputy "had the opportunity to evaluate the demeanor of the persons who testified and was able to include witness demeanor when weighing credibility, even if not expressly commenting on that demeanor."

Hinegardner's argument stems from the language of section 17A.19(10)(f), which provides that we must reverse or modify an agency decision when not supported by substantial evidence in the record when that record is viewed as a whole. The phrase "when that record is viewed as a whole" means

> that the adequacy of the evidence in the record before the court to support a particular finding of fact must be judged in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it, *including any determinations of veracity by the presiding officer who personally observed the demeanor of the witnesses* and the agency's explanation of why the relevant evidence in the record supports its material findings of fact.

Iowa Code § 17A.19(10)(f)(3) (emphasis added). Because the deputy's credibility determination was based on statements Hinegardner made outside of the arbitration hearing, Hinegardner argues it is not entitled to any deference.

A credibility determination based on personal observation of a witness's demeanor is only one factor to be considered in determining whether substantial evidence supports the decision. *See id.* (stating "all relevant evidence in the record" must be considered). In affirming the arbitration decision, the commissioner noted not only the deputy's credibility finding, but also the relative strength and credibility of the three expert witnesses' testimony. The commissioner then went on to find that, even setting aside the deputy's credibility findings, "some of claimant's explanations for his behavior prior to July 28, 2008 defy common sense," noting discrepancies in Hinegardner's claim he was not using narcotics for pain relief before the date of his alleged injury despite having filled prescriptions for narcotics on multiple occasions leading up to July 28, 2008—including two days before. Based on the record evidence, the commissioner arrived at the same conclusion as the deputy. Even setting aside the "considerable deference" given to the deputy's credibility finding, the commissioner's independent arrival at the same conclusion shows substantial evidence supports the finding.

**B. Causation.**

Hinegardner also challenges the sufficiency of the evidence supporting the causation finding. He contends there is insubstantial evidence supporting the commissioner's finding that his condition was pre-existing and was not materially aggravated, accelerated, or worsened by a work-related incident.

"Medical causation is a question of fact vested in the commissioner's discretion." *Mike Brooks*, 843 N.W.2d at 889. It is "within the domain of expert

testimony." *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011). The weight given to an expert's testimony depends on the accuracy of the facts the expert relied upon and other surrounding circumstances; if it is based on an incomplete history, the opinion is not binding upon the commissioner. *Id.* Ultimately, the decision to accept or reject an expert's opinion is within the "peculiar province" of the commissioner. *Id.*

In the appeal decision, the commissioner states:

> Claimant argues the presiding deputy ignored or did not give sufficient weight to independent evaluation physician, Robin Epp, M.D., opinion that the differences between the lumbar MRI performed in 2000 and that performed in 2008 related to claimant's purported work incident of July 28, 2008. Dr. Epp provided no medical rationale supporting that conclusion. In contrast, both Dr. Gordon and Dr. VanFleet fully explained their reasons for not attributing differences on reports of the MRIs performed eight years apart and interpreted by different radiologists to a particular incident. Furthermore, Dr. VanFleet has expertise on lumbar spinal conditions that Dr. Epp cannot claim.

The weight and credibility assigned to these experts' opinions, as well as the opinion of Dr. Okey, was for the commissioner to determine. *See St. Luke's Hospital v. Gray*, 604 N.W.2d 646, 652 (Iowa 2000) (stating the weight to be given to expert testimony is for the finder of fact); *Sherman v. Pella Corp.*, 576 N.W.2d 312, 321 (Iowa 1998) ("The commissioner, as the fact finder, determines the weight to be given to any expert testimony."). Our review of the commissioner's finding regarding the conflicting expert witness opinions is limited to whether it is supported by substantial evidence in the record made before the agency when that record is viewed as a whole. *See Dunlavey v. Economy Fire & Casualty Co.*, 526 N.W.2d 845, 855 (Iowa 1995). When reviewing the expert

witness testimony, coupled with the claims Hinegardner has made that conflict with other evidence in the record, we find substantial evidence supports the commissioner's finding that Hinegardner did not suffer a compensable work injury on July 28, 2008.

Because substantial evidence supports the commissioner's finding on causation, we need not address Hinegardner's argument regarding the extent of his disability. Having reached the same conclusion as the district court, we affirm.

**AFFIRMED.**