# IN THE COURT OF APPEALS OF IOWA

No. 16-2102
Filed November 8, 2017

**TYLER JAMES LONG,**
        Petitioner-Appellant,

**vs.**

**HALEY MARIE WARNKE,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Guthrie County, Paul R. Huscher,

Judge.

A father appeals the district court's custody decree finding joint physical

care was in the child's best interests. **AFFIRMED.**

Dorothy L. Dakin and Daniel J. Johnson of Kruse & Dakin, L.L.P., Boone,

for appellant.

Jessica L. Morton of Bruner, Bruner & Reinhart LLP, Carroll, for appellee.

Heard by Danilson, C.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Tyler Long appeals the decree entered by the district court finding he and Haley Warnke should have joint physical care of their young child. He argues placement in his physical care—rather than joint physical care—is in the child's best interests. Haley seeks appellate attorney fees. Upon our review, we affirm the court's custody determinations and award Haley $3000 in attorney fees.

### I. Standard of Review.

We review child-custody determinations made pursuant to Iowa Code chapter 600B (2016) de novo. *See McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010); *see also* Iowa R. App. P. 6.907; *Wilker v. Wilker*, 630 N.W.2d 590, 594 (Iowa 2001). This requires an examination of the whole trial record to decide anew the issues raised on appeal. *See Wilker*, 630 N.W.2d at 594. Despite our de novo review, we give strong consideration to the district court's fact findings, including any credibility findings. *See id.*; *see also* Iowa R. App. P. 6.904(3)(g). In child-custody cases, the first and foremost consideration is the child's best interest. *See In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015); *see also* Iowa Code § 600B.31; Iowa R. App. P. 6.904(3)(o); *Phillips v. Davis-Spurling*, 541 N.W.2d 846, 847 (Iowa 1995).

### II. Background Facts and Proceedings.

On our de novo review, we make the following findings of fact. Both Tyler Long and Haley Warnke were born in 1993. They met in high school and graduated in approximately 2011. In winter 2013, Tyler and Haley had a short relationship, during which Haley became pregnant. At that time, Haley was married to another man and in the process of getting a divorce.

In April 2014, Haley told Tyler she was pregnant with his child, but he did not believe he was the child's father. Haley's divorce was finalized in May 2014. During the pregnancy, Haley received no assistance from Tyler.

Haley gave birth to A.M.L. in December 2014; however, because Tyler did not believe the child was his, Haley did not put his name on the birth certificate. Nevertheless, Haley let Tyler know when she went into labor and sent a picture of the child the morning of the child's birth. Tyler came to see the child the next day. A paternity test in January 2015 confirmed Tyler was the child's father, and Tyler was later designated the child's father on her birth certificate.

Tyler had sporadic visitation with the child during the first six or seven months of the child's life. Until approximately August 2015, Tyler's visits with the child usually occurred at Haley's request. If Haley needed a babysitter, she usually checked with Tyler and his mother to see if they wanted to keep the child instead. Tyler did not offer Haley any sort of financial support at that time.

After August 2015, Tyler became more involved in the child's life, and he generally had the child on weekends. Haley also offered Tyler occasional time during the week, which Tyler accepted. Additionally, Tyler provided some diapers and clothes for the child, and twice he gave Haley some money. In October 2015, Haley asked Tyler if there was "any way [they] could come to an agreement for child support," and Tyler answered, "No, I don't think so."

Tyler testified that by the end of 2015, he had more overnights with the child than Haley.[1] Haley disputed his claim overall, but she admitted there may

---

[1] This is according to Tyler's testimony and a calendar admitted at trial, but Tyler admitted he did not create the calendar. Tyler testified it was accurate, but on cross-

have been one or two months where he might have had the child more days than her. She testified that her work schedule at that time changed frequently, and rather than using a babysitter, she would ask Tyler if wanted to take the child. She also testified and provided paystubs showing she worked as a certified nursing assistant full-time plus overtime hours. According to Tyler's calendar, by March 2016, he and Haley had almost equal time with the child.

In March 2016, Tyler received a notice from the Child Support Recovery Unit that Haley was seeking child support. A few weeks later, Tyler filed his petition to establish custody and other matters related to the care of the child. He agreed he and Haley should have joint legal custody, but he asked that the child be placed in his physical care. Haley answered and requested the child be placed in her physical care.

The matter was tried to the court in November 2016. After hearing the parties' testimony, along with their witnesses' testimony, and receiving numerous exhibits, the court ruled from the bench at the end of the trial, finding shared physical care was in the child's best interests. The court stated:

> The court is aware that custody cases always seem to bring out the worst of the parties. They seem to poison the relationships between the parties and the family members or extended family members.
> In looking at this case, the court, to some extent, looks at the relationship that these parties had, the complaints that they had, and the manner in which they related to each other prior to the legal proceedings, the involvement of attorneys, the marshaling of evidence, and the pitting of sides against each other.

---

examination there were some challenges to its precision. Additionally, Haley testified the calendar was not accurate, explaining the calendar said Tyler had the child every weekend in 2015, but she recalled having the child on some weekends with her other two children.

It appears that primarily the child was in the care of [Haley] from birth; that she was more than willing to provide contact between the child and [Tyler]. It is difficult for the court to determine whether [Tyler] comes into this court complaining that he had too much visitation, but it was his record to make that he had way more than half of the time.

It is [Tyler] who urges that the parties are unable to communicate and offered, although the court did not accept it, but offered over 100 pages of text messages.

There is no question that both parties care about their child. This is a case where there is very little history and very little for the court to go on. The parties, who spent approximately a week together, they have no established relationship for the court to review. The parties were never married. Didn't live together. Neither one has a particularly stable relationship for the court to look at. The parties have moved some. They are, as the court might expect, establishing other relationships. But even as far as the care of the child, it is a child of less than two years of age.

Substantially, [Tyler]'s argument is that he wants to have a better mother for the child than the mother that he selected. The court must choose or decide between the two parents that the child has which is the most likely to provide for the child, most likely to support the other parent's relationship with the child, and then whose care the child is more likely to grow to be happy and healthy. And it is not the function of the court to provide a different or a better parent, and this court is reluctant to try to base custody decisions on voluntary conduct by the parents that is socially and legally acceptable.

While the court can certainly express its own opinions regarding the healthiness of smoking or drinking or riding motorcycles or riding on four-wheelers or hunting or shooting bows and arrows or fishing or any number of other things, it is not the function of the court to determine that parties who come before the court must comply with the court's preference as far as the way people live their lives.

The court is required to consider whether or not a shared physical care arrangement is appropriate when it is requested by the parties. In fact, the court can consider whether a shared physical care arrangement is appropriate even when neither of the parties requests such an arrangement.

This court notes that on a temporary basis the court ordered that the parties have a shared physical care arrangement. Other than the difficulties of a one-week time frame, alternating weeks essentially between the parents, the court has no evidence in this record that a shared physical care arrangement did not provide the maximum contact with both parents and was not in the child's best interest.

The court does note that this is a young child. It is a child of one and a half years. With parents who are young, who are still addressing issues of relationships, their interpersonal relationships. They're establishing their homes. The court finds that it would be entirely reasonable to expect that one or both parties may change their residence in the next year or two.

The court is not terribly concerned about which school district this child will attend. The court finds that it is in the child's best interest to have a shared care arrangement where the child has the opportunity to be parented by both parents for the next four years or so, before any determination must be made as far as the geographical distance and school matters.

Having considered all of the factors that are set forth in The Code, as well as in the case of *In Re Winter*, the court does find these parties should have a shared physical care arrangement. They should have joint legal custody of the minor child. Child support should be established in accordance with the child support guidelines.

The court then filed a written decree incorporating its oral pronouncement into the decree.

Tyler now appeals the court's decree, arguing it was in the child's best interests that she be placed in his physical care rather than the shared-physical-care arrangement found by the court. Haley resists and requests appellate attorney fees. We address their arguments in turn.

### III. Discussion.

### A. Physical Care.

"Iowa Code chapter 600B confers subject matter jurisdiction upon the district court to decide cases of paternity, custody, visitation and support between unmarried parties." *Montgomery v. Wells*, 708 N.W.2d 704, 707 (Iowa Ct. App. 2005). Relevant here, "section 600B.40 grants the district court authority to determine matters of custody and visitation as it would under Iowa Code section

598.41"—section 600B.40's counterpart for divorcing or separating parents. *See id.*; *see also Braunschweig v. Fahrenkrog*, 773 N.W.2d 888, 891 n.3 (Iowa 2009).

"Physical care" is "the right and responsibility to maintain a home for the minor child and provide for routine care of the child." Iowa Code § 598.1(8). If joint physical care is awarded, "both parents have rights to and responsibilities toward the child including, but not limited to, shared parenting time with the child, maintaining homes for the child, [and] providing routine care for the child." *Id.* § 598.1(4). Even though the parties disagree on some matters, these problems should be able to be resolved to the benefit of the child. *See In re Marriage of Gensley*, 777 N.W.2d 705, 716 (Iowa Ct. App. 2009). "When joint physical care is not warranted, the court must choose one parent to be the primary caretaker, awarding the other parent visitation rights." *In re Marriage of Hynick*, 727 N.W.2d 575, 577 (Iowa 2007).

In determining whether to award joint physical care or physical care with one parent, the district court is guided by the factors enumerated in section 598.41(3), as well as other nonexclusive factors set out in *In re Marriage of Winter*, 233 N.W.2d 165, 166-67 (Iowa 1974), and *In re Marriage of Hansen*, 733 N.W.2d 683, 696-99 (Iowa 2007) (holding that although section 598.41(3) does not directly apply to physical care decisions, "the factors listed [in this code section] as well as other facts and circumstances are relevant in determining whether joint physical care is in the best interest of the child"). *See also McKee*, 785 N.W.2d at 737. Although consideration is given in any custody dispute to allowing the child to remain with a parent who has been the primary caretaker, *see Hansen*, 733 N.W.2d at 696, the fact that a parent was the primary caretaker

of the child prior to separation does not assure an award of physical care, *see In re Marriage of Toedter*, 473 N.W.2d 233, 234 (Iowa Ct. App. 1991). The ultimate objective of a physical care determination is to place the child in the environment most likely to bring her to healthy physical, mental, and social maturity. *In re Marriage of Murphy*, 592 N.W.2d 681, 683 (Iowa 1999); *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa Ct. App. 1996). As each family is unique, the decision is primarily based on the particular circumstances of each case. *Hansen*, 733 N.W.2d at 699.

Here, the district court had the advantage of listening and observing each witness's demeanor firsthand. While the court did not make any express credibility findings, we believe implicit in the court's ruling is the conclusion the court, as the trier of fact, found Haley to be more credible than Tyler. *See, e.g.*, *City of Riverdale v. Diercks*, 806 N.W.2d 643, 655 (Iowa 2011) ("Under these circumstances, we must assume the district court implicitly rejected the City's good-faith defense."); *Schutjer v. Algona Manor Care Ctr.*, 780 N.W.2d 549, 560-61 (Iowa 2010) (applying standard to "work backward" and ascertain implicit credibility findings in workers' compensation commissioner's decision); *Norland v. Iowa Dep't of Job Serv.*, 412 N.W.2d 904, 909 (Iowa 1987) (deducing "the department implicitly found that there was no good cause to refuse the offered work in this case"). Importantly, the court did not find Tyler's claim that he and Haley were unable to communicate credible, pointing out that Tyler sought to enter "over 100 pages of text messages" into evidence.

In fact, more than 200 pages of text messages spanning more than a year *were* admitted into the record, showing the parents communicated almost every

day via texts. At the beginning, most text messages were initiated by Haley—sometimes unrelated to the child—but Tyler generally responded when he could. There was occasional bickering between them, particularly after the custody action was filed, but for the most part, for all of their faults, the record shows the parents actually communicated very well. They sent text messages to each other regularly about the child; when the child was with one parent, the other parent checked in to see how the child was. Each texted pictures of the child to the other parent while the child was in his or her care. They told the other parent about the child's moods and the child's health. Haley generally told Tyler about doctor appointments she made for the child, and Tyler even took Haley to some of the child's appointments. Tyler may not have *wanted* to have to communicate with Haley, but the parents were clearly able to communicate with each other regarding the child's needs.

Haley was the child's primary caregiver after the child's birth. When Tyler increased his involvement in the child's life, he eventually reached the point where he was very involved in the child's day-to-day care. But his assertion that he "was a paragon of stability for [the child] while Haley was socializing, working, moving, and romanticizing the plethora of men she had in and out of her life since [the child] was born," ignores the fact he was not really involved at all the first six months of his young child's life. Haley cared for their child without any assistance from Tyler. Haley is not a perfect parent, but there is no question she was a suitable custodian for the child.

Tyler characterizes the times Haley placed the child in the care of others as pawning the child off and believes Haley's actions show the child has "take[n]

a back seat to [Haley's] work and social life," but the text messages paint a different story. Haley works regularly with a frequently changing schedule. Once Tyler was more involved in the child's life, Haley clearly felt comfortable asking him to care for the child when she could not. To his credit, he and his family were almost always available when Haley asked. Nevertheless, her texts show she made no demands that he care for the child; she just offered him the opportunity to spend more time with the child when she knew she needed to make alternative care arrangements. A few texts indicate Haley may have asked Tyler and his family to care for the child so she could make other plans, but the overwhelming majority of her messages evidence her requests were due to changes to her work schedule or the unavailability of her regular caregiver.

Here, the parents live near each other and were able to meet in the middle of their locations to exchange the child. As the district court found, the parents' shared physical-care arrangement worked very well for the parties, and clearly the arrangement allowed the child to spend the maximum amount of time with each parent. Both parties are young, as is their child. Tyler points out Haley smokes and drinks alcohol, asserting this makes him a better caregiver for the child. Yet, the evidence showed both that Haley did not generally smoke or drink in the child's direct vicinity and the child was exposed at times to smoking or drinking when in Tyler or his family's care. Like the district court recognized, regardless of any personal preference, these activities are legal. Considering the child's best interests, permitting the child to have the maximum contact available with both parents outweighs Tyler's concerns.

Ultimately, upon our de novo review of the record, and considering the numerous applicable factors, we agree with the district court's conclusion that shared physical care between the parties is in the child's best interests. Accordingly, we affirm on the issue.

### B. Appellate Attorney Fees.

"In a proceeding to determine custody or visitation, . . . the court may award the prevailing party reasonable attorney fees." Iowa Code § 600B. Here, Haley originally requested appellate attorney fees in the amount of $5500. At oral argument she increased her request to $7500 to account for the time and costs attendant to the oral argument. Whether to award appellate attorney fees is within our discretion. *See Spiker v. Spiker*, 708 N.W.2d 347, 360 (Iowa 2006). An award of appellate attorney fees depends on three factors: (1) the needs of the party making the request, (2) the ability of the other party to pay, and (3) whether the party making the request was obligated to defend the trial court's decision on appeal. *Id.* After considering the appropriate factors, we award Haley appellate attorney fees of $3000.

### IV. Conclusion.

Having reviewed the record de novo, we agree with the district court that placement of the parties' child in their shared physical care was in the child's best interests. Accordingly, we affirm the district court's custody decree, and we award Haley appellate attorney fees of $3000. Costs on appeal are assessed to Tyler.

**AFFIRMED.**