# IN THE COURT OF APPEALS OF IOWA

No. 14-1511
Filed December 23, 2015

**BRANDEE RAE PETTENGILL,**
Petitioner-Appellee,

**vs.**

**AMERICAN BLUE RIBBON**
**HOLDINGS, LLC, and**
**ARCH INSURANCE COMPANY,**
Respondents-Appellants.

_____

Appeal from the Iowa District Court for Linn County, Nancy A. Baumgartner, Judge.

American Blue Ribbon Holdings, LLC, and Arch Insurance Company appeal the district court's reversal of the Iowa Workers' Compensation Commissioner's decision. **AFFIRMED.**

Michael L. Roling and Joseph M. Barron of Peddicord, Wharton, Spencer, Hook, Barron & Wegman, L.L.P., West Des Moines, for appellants.

T. Todd Becker of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellee.

Considered by Tabor, P.J., and Bower and McDonald, JJ.

**BOWER, Judge.**

American Blue Ribbon Holdings, LLC, and Arch Insurance Company (American) appeal the district court's reversal of the Iowa Workers' Compensation Commissioner's decision. American claims the district court erred in reversing the commissioner's conclusion Pettengill was not entitled to temporary benefits after she reached maximum medical improvement on January 15, 2011. We affirm the district court's decision and remand to the commissioner for the calculation of penalty benefits and a determination if any healing period benefits are owed.

## I.      BACKGROUND FACTS AND PROCEEDINGS

On October 23, 2010, while working as a cook at a Cedar Rapids Village Inn (owned by American), Pettengill slipped on a freshly cleaned floor and fell, injuring her lower back. She was twenty-four years old at the time of the fall. Prior to her fall, Pettengill had obtained treatment for low-back pain on three occasions. She first complained of low-back pain stemming from an injury caused from playing volleyball in 2001. The treating doctor opined the pain was likely musculoskeletal in origin and prescribed an anti-inflammatory. In October 2009, Pettengill saw Dr. Stephen Runde for upper respiratory type symptoms and low-back pain. She was diagnosed with an acute lumbosacral strain. Finally, on October 2, 2009, Pettengill was seen by physician assistant Rebecca White, for difficulty breathing and back pain with radiation down her buttocks and backs of her legs. Pettengill complained of an inability to sit or stand. White's

examination of Pettengill's back did not reveal any issues. Pettengill was prescribed anti-inflammatories and muscle relaxants.

The day after the fall, Pettengill went to Mercy Care North reporting she had fallen at work and complaining she had hurt her elbow, right knee, and low back. Runde diagnosed Pettengill with a myofascial strain. The radiology tests were negative for any injury. Pettengill returned to Mercy on October 28 for a recheck of her back and was seen by Dr. Sudha Anand. Anand found Pettengill had tenderness over the L4 and L5 spinous process and the paravertebral muscle area. Anand's assessment was Pettengill had a low-back sprain. Pettengill returned to Mercy for a recheck on November 2, and was again seen by Anand. Anand found Pettengill's injury was not improving.

On November 9, Pettengill returned to Mercy for a recheck and was seen by Dr. Runde. Runde found Pettengill's pain was persisting. He noted she was now totally off work. Subsequently, Pettengill had an MRI completed and returned to Mercy on December 1. Runde found the MRI showed Pettengill had a disk extrusion at L5-S1, but no evidence of spinal stenosis or nerve root impingement. Runde considered referring Pettengill to a pain management clinic for epidural injections, or to occupational medicine for a second opinion.

Pettengill was approved for nine sessions of physical therapy by Runde. Physical therapist Christopher Brink evaluated Pettengill and reported, "The patient displays signs and symptoms consistent with low back pain with radiculopathy stemming from a herniated disc of the L5 region. She will benefit from continued outpatient physical therapy focusing on decreasing inflammation

and pain, promoting centralization of the herniated disc, and increasing left lower extremity function." Pettengill attended four of the scheduled physical therapy sessions.

Pettengill was again seen by Runde on January 14, 2011. He noted she had attended several physical therapy sessions, without success. Runde and Pettengill discussed an epidural injection. Runde scheduled a consult for Pettengill with an anesthesiologist, Dr. Stephen Maze, for January 24. Maze found Pettengill had attempted conservative care in the three months since her injury and had not experienced improvement. He "strongly recommended a lumbar epidural steroid injection . . . to hopefully assist in her recovery." Pettengill then requested epidurals, which were denied by the insurance carrier.

Pettengill saw Runde again on February 10. Pettengill reported she had gotten somewhat better since her previous appointment. Upon examination, Runde found Pettengill was "mildly uncomfortable" with some tenderness in the left lower lumbosacral area. Runde recommended Pettengill see a workers' compensation specialist, Dr. Michael Jackson, and remain off work.

The next day, Pettengill saw Jackson, though it was his last day in the clinic and he did not dictate notes for Pettengill's visit. Pettengill returned to Runde on June 13, with complaints of back pain. His notes from the visit indicate the workers' compensation insurer had not been responsive to Pettengill in the preceding months:

> It has been four months since [the patient] has been in. She has kind of been in "medical limbo" since that time. She had an evaluation including an MRI and been seen by Dr. M[aze] and it was recommended that she may be a candidate for an epidural

> steroid injection. However, the work comp insurance company, in particular their physician reviewer, would not approve the epidural so it has never been done. . . . She has been kind of hung out to dry since then. The insurance company has not been answering her calls and also they have not been paying her for the last couple of months, even though she has remained off of work. She has finally badgered someone in to getting approval for a one-time visit with me to kind of reassess the situation and get her some pain medication. It has been almost three months since she had any pain medication from us, so I do not think there is a question of drug seeking behavior.

Pettengill had stopped receiving healing period checks in April 2011. According to Runde, Pettengill had not progressed since her last appointment.

Pettengill retained an attorney in June 2011 who contacted her insurance company. She filed a petition for alternate care on September 12, with a hearing set for September 22. The insurance company's counsel gave its approval for an injection one day before the hearing. Pettengill also filed a petition for workers' compensation benefits on September 27, 2011, with a hearing set for September 17, 2012.

Pettengill received her first epidural steroid injection in October 12, 2011. Dr. Maze reported Pettengill received a "modest benefit where her pain was relieved and she was able to stand for a longer period of time, but was not quite pain free." Upon Maze's recommendation, a second epidural was approved and subsequently administered on January 11, 2012.

The insurance company referred Pettengill to Dr. Robert Broghammer for an independent medical examination (IME), and he examined her on January 6. Broghammer recommended an EMG/Conduction study and noted:

> [I]f Ms. Pettengill has a chronic left leg radiculopathy, I would opine that this likely is related to her alleged injury and would find the

company liable for treatment until her symptoms abate. If it does not show a left leg radiculopathy, I would not relate anymore of her ongoing symptoms due to her alleged injury and would opine she would be at MMI and release her to return to work full duty, with further follow up per her primary care physician.

Dr. Sunny Kim conducted the study and found it showed a "[n]ormal study without electrophysiological evidence of left lumbosacral radiculopathy, plexopathy or peripheral polyneuropathy." Broghammer issued a report on February 15, in which he concluded "[g]iven the negative studies, the worker's ongoing pain is unexplained by her remote injury. I opine that any further treatment for her idiopathic and ongoing back pain should occur outside the auspices of the worker's compensation system . . . ."

At the request of Pettengill's counsel, she underwent an additional IME performed by Dr. Richard Nieman. After the examination, Nieman concluded:

> I have absolutely no idea why she was not considered for surgery. This is a large disk extrusion. Certainly she would benefit from an operative approach. I strongly advise that she have another MRI scan. If confirmatory of her continued disk herniation, she should be seen by a surgeon, consideration for micodiskectomy. I have used Dr. Chad Abernathey, and he does an excellent job for this type of situation.

Dr. Neiman assessed a 13 percent impairment rating and the following restrictions:

> a) Avoid lifting more than five-ten pounds repetitively;
> b) Avoid standing for any length of time;
> c) Avoid squatting, kneeling, or bending;
> d) No driving more than one hour at a time;
> e) Provide the ability to change positions from sitting to standing.

Dr. Abernathey evaluated Pettengill on April 18, 2012. He diagnosed her as having a mild degenerative change at L5-S1 with a small annular tear. Based

on the MRI, Dr. Abernathey did not recommend surgery. He opined her work-related injury would have healed within six to twelve weeks of the October 23, 2010 injury, and she would have reached maximum medical improvement (MMI) at that time. Dr. Abernathey believed the disk protrusion was not related to work, but was actually a congenital defect.

In its opinion the commissioner highlighted the differences in the doctors' opinions:

> There is a significant difference in opinion between Dr. Broghammer and Dr. Abernathey, who believe claimant has a chronic congenital and personal condition that is unrelated to her work fall, and that of Dr. Neiman. Dr. Neiman believes strongly that claimant has a huge disk protrusion which is the result of the fall and, thus, the fall is responsible for all claimant's disability. No doctor opined that claimant's preexisting condition was aggravated permanently by the work injury. Dr. Neiman premises his opinion on a new injury. The disk protrusion allegedly caused by the work injury.
>  . . . .
> Later, however, Dr. Runde agreed that Dr. Abernathey would have a better understanding of claimant's condition and would, in fact, defer to Dr. Abernathey's conclusions.
> Dr. Runde changed his mind again on September 14, 2012, indicating that he would stand by the permanent work restrictions set forth on August 13, 2012.
> Sunny Kim, M.D., who performed the EMG, wrote that a person who injures the back can have pain down the lower extremities without a specific injury to the spinal nerve root. However, the EMG did not show that there was an acute injury at one time which then healed; nor did the EMG show any sign of a chronic radiculopathy, which suggests that there was never any injury to the nerve root from claimant's work injury.

The hearing on Pettengill's petition for workers' compensation benefits was held on September 17, 2012. A deputy workers' compensation commissioner issued an arbitration decision on December 12, and found Pettengill failed to meet her burden of proof to show her ongoing back problems

were related to the injury she sustained at work in October 2010. The deputy found Pettengill was not entitled to additional temporary benefits for the period of April 20, 2011 through March 18, 2012. Further, and for the same reason, the deputy found Pettengill was not entitled to penalty benefits for failure to pay temporary benefits for that period.

Pettengill filed a notice of appeal with the Iowa Workers' Compensation Commissioner on December 28. The commissioner issued an appeal decision on July 28, 2013, affirming and adopting the deputy's decision.

Pettengill filed a petition for judicial review on August 14. The district court's ruling reversed the commissioner and remanded the case to the commissioner for a determination of healing period and penalty benefits. American appealed.

## II.     STANDARD OF REVIEW

Iowa Code section 17A.19(10) (2011) governs judicial review of agency decision making. We will apply the standards of section 17A.19(10) to determine whether we reach the same results as the district court. "The district court may grant relief if the agency action has prejudiced the substantial rights of the petitioner, and the agency action meets one of the enumerated criteria contained in section 17A.19(10)(a) through (n)." *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 255–56 (Iowa 2012) (citation omitted).

Our standard of review depends on the aspect of the agency's decision that forms the basis of the petition for judicial review. *Id.* at 256. We are to defer to the agency's interpretation of a statute when the legislature has clearly vested

the agency with the authority to interpret a statute, and "only reverse a decision of statutory construction which is irrational, illogical, or wholly unjustifiable." *Westling v. Hormel Foods Corp.*, 810 N.W.2d 247, 251 (Iowa 2012); *see also* Iowa Code § 17A.19(10)(*l*). If the agency is not clearly vested with such authority, however, we review questions of statutory interpretation for correction of errors at law. *Westling*, 810 N.W.2d at 251; *see also* Iowa Code § 17A.19(10)(c).

Here, we are reviewing the commissioner's interpretation of Iowa Code section 86.13, which deals with penalty benefits. An examination of chapter 86 does not reveal any basis for concluding that the legislature clearly vested the workers' compensation commissioner with authority to interpret the section at issue. Accordingly, we review the commissioner's statutory interpretation for correction of errors at law. Iowa Code § 17A.19(10)(c).

## III. DISCUSSION

American claims the district court erred in reversing the commissioner's conclusion Pettengill was not entitled to temporary benefits after she reached MMI on January 15, 2011. Pettengill claims she was entitled to the benefits because American had terminated the payments in violation of Iowa Code section 86.13(2).

The commissioner found:

> Claimant seeks additional weekly benefits pursuant to Iowa Code section 86.13(4). This particular provision requires that if a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse, the workers' compensation commissioner shall award additional weekly benefits in an amount not to exceed 50 percent of the amount of benefits

that were unreasonably delayed or denied. Iowa Code section 85.13(4)(b).

. . . .

Defendant has the burden to show compliance with this statutory provision in order to avoid the mandatory assessment of a penalty. The inquiry under the current provision of Iowa Code section 86.13 requires more than a reasonable or probable cause or excuse at the time the case comes to hearing. The law requires proof of a prompt investigation and that factual basis be provided to the injured worker at the time of the denial, delay, or termination of benefits. Herein, defendant must show a timely investigation of claimant's report of a back injury, that the denial of the back claim is based on the results of that timely investigation, and that there was a timely communication to claimant of the reasons for the denial. From February 2011 until approximately July 2011, claimant received no information from defendant as to why her claim had been denied. Dr. Broghammer indicated that claimant was not a surgical candidate, but it was not until late fall of 2011 that defendants engaged in any investigation of claimant's ongoing back claims. Defendants wrote inquiring on November 29, 2011, why claimant was not capable of working. On December 8, 2011, defendants wrote again requesting claimant's deposition.

On January 12, 2012, defendants indicated that an EMG would be ordered per Dr. Broghammer's recommendations. Dr. Broghammer's opinions on February 15, 2012, essentially provide a zero percent impairment. Defendants paid temporary benefits from October 29, 2010, through March 19, 2011, for a total of $6,153.79.

Defendants assert benefits were terminated when claimant refused to follow up with Dr. Runde. Claimant says that this was totally inaccurate and that she wanted to see Dr. Runde, but that the insurance company never authorized this care. There was no documentation in the file indicating that claimant was ever notified of the cessation of her benefits or the reason why these benefits were terminated.

Claimant testified that she was given no notice her benefits were going to end. She called and called workers' compensation. She even called the claims manager's supervisor who authorized a one-time visit with Dr. Runde.

Because it is found that claimant achieved MMI on January 15, 2011, for symptoms arising out of the October 23, 2010 work injury there was no delay in benefits paid even though post-January 15, 2011, defendants' communication with claimant was disappointing and, if not within the letter of the law, definitely not within the spirit of the law. (Iowa Code section 86.13(4)(b)).

The district court reversed the commissioner's decision and found notice had not been given to Pettengill before her benefits were terminated, as required by Iowa Code section 86.13. The court remanded the commissioner's decision for the determination of penalty benefits, and whether Pettengill was entitled to healing period benefits between April 2011 and March 2012.

On appeal, our task is to evaluate the commissioner's interpretation of Iowa Code section 86.13. The relevant portions of section 86.13 provide:

> 2. If an employer or insurance carrier fails to file the notice required by this section, the failure stops the running of the time periods in section 85.26 as of the date of the first payment. If commenced, the payments shall be terminated only when the employee has returned to work, or upon thirty days' notice stating the reason for the termination and advising the employee of the right to file a claim with the workers' compensation commissioner.
> . . . .
> 4. a. If a denial, a delay in payment, or a termination of benefits occurs without reasonable or probable cause or excuse known to the employer or insurance carrier at the time of the denial, delay in payment, or termination of benefits, the workers' compensation commissioner shall award benefits in addition to those benefits payable under this chapter, or chapter 85, 85A, or 85B, up to fifty percent of the amount of benefits that were denied, delayed, or terminated without reasonable or probable cause or excuse.
> b. The workers' compensation commissioner shall award benefits under this subsection if the commissioner finds both of the following facts:
> (1) The employee has demonstrated a denial, delay in payment, or termination of benefits.
> (2) The employer has failed to prove a reasonable or probable cause or excuse for the denial, delay in payment, or termination of benefits.
> c.[1] In order to be considered a reasonable or probable cause or excuse under paragraph "b", an excuse shall satisfy all of the following criteria:

---

[1] The language in this subsection was added to the statute pursuant to a 2009 Amendment. *See* 2009 Iowa Acts ch. 179, § 110.

(1) The excuse was preceded by a reasonable investigation and evaluation by the employer or insurance carrier into whether benefits were owed to the employee.

(2) The results of the reasonable investigation and evaluation were the actual basis upon which the employer or insurance carrier contemporaneously relied to deny, delay payment of, or terminate benefits.

(3) The employer or insurance carrier contemporaneously conveyed the basis for the denial, delay in payment, or termination of benefits to the employee at the time of the denial, delay, or termination of benefits.

Iowa Code section 86.13(4)(b) creates a two-prong test that requires the agency to award a claimant penalty benefits if (1) "The employee has demonstrated a denial, delay in payment, or termination of benefits"; and (2) "The employer has failed to prove a reasonable or probable cause or excuse for the denial, delay in payment, or termination of benefits."  Concerning the first prong, the commissioner concluded Pettengill satisfied her burden in showing her benefits were terminated.  For the second prong, the burden shifted to American to prove it had "a reasonable or probable cause or excuse . . . for the termination."

In order to be considered a reasonable or probable cause or excuse under paragraph "b," an excuse shall satisfy the three criteria listed in paragraph "c." The commissioner complained American did not communicate with Pettengill, and also noted American did not perform the requisite investigation for months after the termination of benefits.  However, the commissioner ruled evidence obtained nearly a year after the termination of benefits demonstrated Pettengill had reached MMI in January 2011, and therefore there was no delay in payments.

We find the commissioner erred in its application of section 86.13(4)(c). (4)(c)(1)-(3) creates a mandatory timeline for the employer to follow in showing it had a "reasonable or probable cause or excuse" for the termination of benefits. First, the employer's excuse for the termination must have been *preceded* by an investigation. Iowa Code § (4)(c)(1). Second, the results of the investigation were "*the actual basis . . . contemporaneously*" relied on by the employer in terminating the benefits. Third, the employer "*contemporaneously* conveyed the basis for the . . . termination of benefits to the employee *at the time of the . . . termination*." American did not carry its burden in demonstrating it followed this mandatory timeline.

American did not conduct the requisite investigation before terminating Pettengill's benefits, demonstrate it contemporaneously relied on the results of an investigation, and contemporaneously convey the basis of the termination to Pettengill. An employer cannot unilaterally decide to terminate an employee's benefits without adhering to Iowa Code section 86.13, to allow otherwise would contradict the language of that section. Since American has failed to carry its burden, we find the commissioner erred in its application of section 86.13 and affirm the district court's award of penalty benefits. Further, we agree with the district court's treatment of the healing period benefits issue:

> Pettengill also appealed the agency's denial of healing period benefits between April 2011 and March 2012. Her healing period benefits were terminated without notice and the agency did not make any findings regarding whether she was entitled to continue receiving benefits because their conclusion was that her benefits were not delayed. The issue of Pettengill's healing period benefits must be remanded to the agency for review of the medical

information available at the time her benefits were delayed or terminated.

We affirm the district court's decision and remand to the commissioner for the calculation of penalty benefits and for a determination if any healing period benefits are further owed.

**AFFIRMED.**