# IN THE COURT OF APPEALS OF IOWA

No. 19-0010
Filed January 9, 2020

**PRESBYTERIAN HOMES & SERVICES, INC., d/b/a MILL POND and ZURICH AMERICAN INSURANCE COMPANY,**
        Plaintiffs-Appellants,

**vs.**

**MARY BUCHANAN,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Sarah Crane, Judge.


        Presbyterian Homes & Services, Inc., doing business as Mill Pond and its insurer Zurich American Insurance Company appeal the district court order affirming in part and reversing in part a final decision of the Iowa Workers' Compensation Commission.  Mary Buchanan cross-appeals.  **AFFIRMED**.


        Valerie A. Foote of Smith Mills Schrock Blades Monthei P.C., West Des Moines, for appellants.

        Matthew Milligan of Schott Mauss & Associates, PLLC, Des Moines, for appellee.


        Considered by Vaitheswaran, P.J., Greer, J., and Potterfield, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**POTTERFIELD, Senior Judge.**

Presbyterian Homes & Services, Inc., doing business as Mill Pond, and its insurer Zurich American Insurance Company (Zurich) appeal the district court order affirming in part and reversing in part a final decision of the Iowa Workers' Compensation Commission. The claimant, Mary Buchanan, cross-appeals. The commissioner found (1) appellee/cross-appellant Buchanan's injury to her left foot and sequela injury to her back were caused by her work for Mill Pond; (2) Buchanan sustained sixty-five percent industrial disability as a result of those injuries; and (3) Buchanan was entitled to penalty benefits because appellants unreasonably withheld healing period payments from October 30, 2014, until August 26, 2015. The district court affirmed the commissioner's findings on medical causation and industrial disability, but it reversed the commissioner's award of penalty payments. Appellants argue the district court erred by finding (1) the commissioner's factual findings on medical causation were supported by substantial evidence; and (2) the commissioner's determination Buchanan had sustained sixty-five percent industrial disability as a result applied the correct legal standard and was supported by substantial evidence. On cross appeal, Buchanan argues the district court erred by reversing the commissioner's decision awarding her penalty benefits.

## I. Background

### a. Prior Work and Medical History

After graduating from high school in 1990, Buchanan worked as a waitress, as an office helper for a shared office, and with a road crew for the Department of Transportation before leaving the workforce in 1993 to become a

stay-at-home parent. Except for working as a field inspector with an agricultural business in the summers of 1997 and 1998, she did not enter the workforce again until 2005. From 2005 to 2012, Buchanan worked in various capacities at group homes and as a home health aide, as well as in seasonal positions with 3M, Lowe's Garden Center, and Professional Homes.

Buchanan earned her certified nursing assistant (CNA) certificate in 2010, and she worked as a CNA at Westhaven Community from 2011 to 2012. She earned her Associate's Degree in 2013. She left Westhaven Community to work at Mill Pond, where she was employed as a full-time CNA until December 2014. Her position required her to stand or walk for long periods of time up to her entire shift, lift or move up to fifty pounds for her entire shift, and lift up to 100 pounds with the use of assistive devices for up to one-third of her shift.

Before the alleged incident, Buchanan had a history of health problems associated with her left foot. She had plantar fasciitis in her left foot that required surgery in 2007. She also reported pain in her left foot in 2008. Dr. Charles Gilarski, with whom she consulted, noted the pain "appears to be something different" and that "[s]he has no problems from the surgical area." Dr. Gilarski directed her to take anti-inflammatory medication and to start a home stretching program. Buchanan did not report any more issues with her left ankle until the injury at issue.

Buchanan also has a history of problems with her right ankle and her back. She sprained her right ankle in 2000 and was treated with a temporary brace, ice, and anti-inflammatory medication. Buchanan has gone to a chiropractor since she was twenty-one years old, largely for maintenance of

intermittent neck and back pain and migraines. She reported to her chiropractor that lifting, twisting, and standing aggravated pain in her lower back. In December 2013, Buchanan claimed she suffered a back injury while working for Mill Pond. She reported having lower back pain while she and a co-worker were moving a patient. She was treated until January 27, 2014, at which time she could return to performing full work duties at Mill Pond.

### b. Ankle Injury

The alleged work injury occurred on February 2, 2014. Buchanan was performing duties as a shower aide, which involved transporting patients from their beds or wheelchairs to the shower using a device called a Hoyer lift. Buchanan later testified using the Hoyer lift required her to plant her feet at shoulder-width apart or more while using her body to turn patients while they were in the lift. While moving patients in the lift on February 2, Buchanan later testified she felt the onset of a constant burning sensation and throbbing pain in her left ankle. She did not immediately report the injury to Mill Pond. She testified she did not report the injury right away because she could not identify what she had done that morning to cause the injury and believed the pain would go away on its own.

Buchanan first sought treatment for her left ankle on April 28, 2014. She was first evaluated by Dr. Scott Thiel, her primary care physician. Buchanan informed Dr. Thiel the pain had been present for about two months and was in a different location than the pain from her plantar faciitis had been. Nonetheless, Dr. Thiel concluded Buchanan's pain was "[c]onsistent with plantar faciitis" and

directed her to wear more supportive shoes, ice her feet three times a day, do foot exercises, and take over-the-counter painkillers as needed.

Her pain persisted, and Buchanan was evaluated by Dr. Gilarski on June 4. Dr. Gilarski diagnosed her with plantar faciitis. Dr. Gilarski's report shows Buchanan told him the pain began seven to ten days before the June 4 visit. The report also states Buchanan informed Dr. Gilarski the pain was unrelated to an injury and was also unrelated to work activities. Buchanan disputed Dr. Gilarski's report during her testimony. She testified that while speaking with her, Dr. Gilarski said her ankle pain was likely from a torn tendon and advised her to either get a different job, spend less time on her feet, or lose weight. Dr. Gilarski did not impose any work restriction on Buchanan, and she continued to work her normal shifts at Mill Pond.

Over the next few months, the pain in Buchanan's left ankle increased. In August, she decided to address her pain with the director of nursing and head of human resources at Mill Pond. Mill Pond agreed to change her shifts from double to single shifts and reduce her overall weekly hours from forty to thirty-two. Mill Pond offered to start workers' compensation, but Buchanan declined based on Dr. Gilarski's assessment.

Buchanan's ankle pain persisted, and she filed an incident report with Mill Pond on October 28. The next day, Buchanan was examined by Dr. Nicholas Bingham, Mill Pond's authorized treating physician. Dr. Bingham's notes from his examination show the cause of Buchanan's ankle pain was "undetermined," but also noted Dr. Bingham lacked access to Buchanan's full medical records. He also questioned Dr. Gilarski's earlier diagnosis and advice to Buchanan,

which he described as coming "after merely one visit and no advanced imaging." Dr. Bingham restricted Buchanan from using the Hoyer lift "as it seems to be the only provocative activity." He also prescribed her anti-inflammatory medication and scheduled a two-week follow up appointment to determine whether Buchanan should be referred to a physical therapist or podiatrist. The follow up assessment happened on November 12. Dr. Bingham received Buchanan's medical records before the November 12 follow up appointment and questioned the reliability of Dr. Gilarski's notes:

> We left it after the last exam that I was going to obtain medical records and I was hopefully going to speak with a foot doctor once I know what [Dr. Gilarski]'s working diagnosis was. . . . In reading [the records], they seem to be quite at odds with what the patient was told when she visited there last spring. For example, she complained of lateral left heel pain but the doctor's diagnosis per his notes was listed as medial band plantar fasciitis. The note stated that they would "follow her closely for the next 3 to 4 weeks;" the patient was told that she did not need to follow. There was no mention of her weight or her changing occupations on the doctor's notes. . . . Due to the unreliability of [Dr. Gilarski]'s notes, I was really not able to consult with the foot doctor I had in mind.

Dr. Bingham concluded his assessment by stating that, because he had not yet received Dr. Thiel's notes, he could not conclude Buchanan's ankle pain was related to her work at Mill Pond. He directed Buchanan to continue the treatment he recommended and to return for re-evaluation in two weeks.

The second re-evaluation happened on November 26. Buchanan told Dr. Bingham she felt "quite a bit better" and not having to use the Hoyer lift had "been quite helpful to her." She also noted she rarely had a chance to put lateral stress on her left ankle, which Dr. Bingham noted was the type of stress that happened while Buchanan used the Hoyer lift. Dr. Bingham determined

Buchanan's gait was normal and that she could return to full duty. He directed Buchanan to avoid lateral stress as much as possible and referred her for an evaluation with a podiatrist. Dr. Bingham checked a box for "Work Related" on Buchanan's November 26 patient status report.

After her visit with Dr. Bingham, Buchanan's next shift was on November 29. She tried to use the Hoyer lift to move patients, but as she used the machine her ankle pain increased to the point she started to limp and could not transfer patients in the Hoyer lift. She contacted Dr. Bingham's office, and her work restriction on the use of the Hoyer lift was reinstated. Dr. Bingham filed another patient status report that same day, which noted Buchanan's injury was work related and requested authorization from Mill Pond for a podiatric evaluation.

Buchanan returned to work on December 3. She was informed Mill Pond would no longer treat Buchanan's injury as a workers' compensation matter, Mill Pond would not be covering her treatment, and she could not return to work until she was released by her doctor at full functionality. Zurich noted it had tried to contact Buchanan in a November 3 letter. It followed up with another letter on November 24 informing her Zurich would not cover her treatment citing Zurich's "inability to speak with you." Buchanan denied receiving either letter, although she admitted during testimony that both letters listed her address correctly.

Following the denial of her claim, Buchanan was evaluated by Dr. Dana Plew, a podiatrist, on December 8. Dr. Plew took x-rays of Buchanan's foot and diagnosed her with peroneal tendonitis. Dr. Plew concluded further testing was appropriate and ordered an MRI. The MRI revealed a tear in the peroneus longus tendon of Buchanan's left ankle. Dr. Plew provided a CAM boot for

Buchanan to wear for the next eight weeks and provided her paperwork for seeking leave under the Family Medical Leave Act (FMLA). The FMLA form, dated December 23, noted Buchanan "has been misdiagnosed" and had been dealing with her condition for ten months. Dr. Plew also filed a certificate with Mill Pond, which informed Mill Pond Buchanan could return to work on February 16, 2015, and forbade Buchanan from lifting more than five pounds, twisting, or standing longer than two hours at a time.

Buchanan followed up with Dr. Plew on January 26, 2015. Dr. Plew applied tape and directed Buchanan to keep applying tape and wean off use of the CAM boot, which she was directed to do in two weeks. Dr. Plew recommended she do exercises for her foot. Buchanan had another follow-up appointment with Dr. Plew on February 23. During this appointment, Dr. Plew instructed Buchanan to keep weaning off use of the CAM boot and ordered physical therapy.

Buchanan attended eight physical therapy sessions between March 6 and April 14. During these visits, Buchanan complained of increased ankle pain. Dr. Plew ordered another MRI, which revealed a stress fracture on the medial cuneiform bone of Buchanan's left ankle.

Dr. Plew wrote an opinion statement on July 20. Dr. Plew noted "tears in the peroneal tendon can happen instantaneously (the result of one wrong step) or develop gradually" and the tear "likely occurred or began" when Buchanan started to feel pain while using the Hoyer lift on February 2, 2014. Dr. Plew concluded it was "more probable than not" that Buchanan's CNA work duties at Mill Pond "caused or were a significant factor" in the tear's development and her

continued work at Mill Pond after the injury "worsened or aggravated" the tear. Dr. Plew also addressed Buchanan's history of plantar faciitis, noting that condition and the tear "are unrelated conditions."

Buchanan was referred to Dr. Julie Albrecht for a surgical consultation. Dr. Albrecht agreed with Dr. Plew's diagnosis and recommended surgery. Dr. Albrecht performed surgery on May 28. Buchanan was given a prescription for pain medication and instructed to begin home exercises and avoid putting weight on her foot. Buchanan received custom orthotics for her feet on August 14. The orthotics were not comfortable. On March 15, 2016, Buchanan complained the orthotics hurt her feet to the point she could not wear them all day as prescribed. Dr. Albrecht recommended Buchanan change orthotics.

By March 28, 2016, Buchanan's pain had worsened. She reported to Dr. Albrecht that her feet felt like they were "broken," and she could not keep wearing the orthotic. She reported pain in both feet, with worse pain in her right foot. She also told Dr. Albrecht she had begun walking on the balls of her feet to help alleviate the pain. She was prescribed new orthotics.

Dr. Albrecht wrote an opinion letter on June 13, 2016. Dr. Albrecht agreed with Dr. Plew's statement about Buchanan's CNA work contributing to Buchanan's continued pain, noting "[o]nce the tendon is torn, any activity aggravates it, thus her work activities as a CNA certainly would have aggravated it." Dr. Albrecht also opined the tear caused both her continued ankle pain and led to the pain in her right foot:

> With regard to her recovery, the left peroneal tendon repair progressed fairly good, but she experienced increase[d] pain in the ankle joint and those symptoms became chronic. She may have

been predisposed to arthritic problem[s] in that area but walking poorly aggravates the lateral joint where the tendon attaches. Her left ankle pain is causally related to the original left peroneal tendon tear.

. . . . With regard to her right ankle pain, the pain is in the same joints as the left foot. This again suggests a predisposition for an arthritic or mechanical problem. Yet, the left peroneal tendon tear caused her to walk poorly for an extended period of time. In my opinion, Ms. Buchanan's disturbed gait over many months, due to the left peroneal tear, was a factor in lighting up her right ankle pain.

Buchanan underwent two independent medical examinations during her treatment. The first was an examination by Dr. Charles Mooney, which happened on August 26, 2015, at Mill Pond's request. Citing Dr. Theil and Dr. Gilarski's records, Dr. Mooney concluded

the medical records do not corroborate an incident occurring on 02/02/2014, nor is it my opinion that the general activities of a CNA, including the use of a Hoyer lift would be a significant intensity to precipitate a tendon tear. . . . Ms. Buchanan's presentation is much more consistent with a chronic condition, such as ankle instability, resulting in tendon tearing.

Buchanan underwent the second independent medical examination at her attorney's request on June 3, 2016. Buchanan was examined by Dr. Sunil Bansal. Dr. Bansal opined that the act of lifting patients with the Hoyer lift "would cause stretching and injury to the peroneal tendons from the traction pressure." Dr. Bansal recommended Buchanan avoid walking for longer than thirty minutes at a time and avoid multiple steps, stairs, uneven terrain, and ladders.

Dr. Mooney responded to Dr. Bansal's evaluation on July 11, 2016. Dr. Mooney maintained his early assessment, again noting "the medical records do not corroborate an injury to the left foot and ankle" and Buchanan's health issues "are related to a personal medical condition preexisting her employment."

### c. Sequela Injury

The alleged sequela injury is a permanent injury to Buchanan's back, which Buchanan alleges was caused by her ankle injury. On July 7, 2015, Buchanan sought treatment related to back pain from Patrick Kasper, a physician assistant. Buchanan told Kasper she had been suffering from back pain for "about a year." Kasper prescribed her a muscle relaxer and weight loss medication. At an August 11 follow up appointment, Buchanan told Kasper her back pain had not improved. Kasper then sent Buchanan to physical therapy. Buchanan's physical therapist noted during an August 18 therapy session that Buchanan "has malalignments in both her low back and pelvis." At another therapy session the week after, the therapist noted Buchanan had an "antalgic gait" when she arrived.

An x-ray of Buchanan's back was taken on February 9, 2016. The x-ray revealed Buchanan had degenerative disc disease, lumbar arthritis, and some spurring. A subsequent MRI showed Buchanan had moderate bilateral facet joint osteoarthritic changes at the L4-L5 level. Buchanan was referred to another doctor for pain management treatment.

Dr. Bansal addressed Buchanan's back pain in his report. He concluded Buchanan's walking on the balls of her feet in response to her foot pain "disturb[ed] her sacroiliac joint biomechanics," which led to her developing both facet anthropathy and sacroiliitis.

> [R]isk factors for sacroiliitis included leg length discrepancy or altered gaits. It is logical that the back pain manifested months after her left foot injury, as this is a cumulative process. As her left foot pathology and pain is permanent, it follows that her back

pathology is permanent as it is being aggravated by her antalgic gait resulting from her foot condition.

. . . .

Furthermore, in my opinion, Ms. Buchanan has underlying facet anthropathy. . . .

The inflammation resulting from the altered gait causes the synovial facet joints to fill with fluid and distend, resulting in pain from stretching the joint capsule.

Dr. Bansal concluded the result of Buchanan's ankle and back conditions was a seven percent whole person impairment based on American Medical Association guidelines. He recommended a work restriction of no lifting over twenty pounds occasionally, and no lifting over ten pounds frequently.

### d. Procedural History

Buchanan filed her arbitration petition in May 2015. A hearing took place before a deputy workers' compensation commissioner on July 13, 2016, and the matter was deemed submitted following submission of briefs on July 27. Buchanan was forty-four years old at the time of the hearing. The issues submitted were

I.      Whether claimant received an injury arising out of and in the course of employment;

II.     The extent of claimant's entitlement to weekly temporary total or healing period benefits, temporary partial disability benefits and permanent disability benefits;

III.    The extent of claimant's entitlement to medical benefits; and

IV.     The extent of claimant's entitlement to penalty benefits for an unreasonable delay or denial of weekly benefits pursuant to Iowa Code section 86.13.

The deputy commissioner concluded Buchanan sustained an injury to her left foot and ankle during the course of her employment on February 2, 2014, and the injury to her back was a sequela injury caused by her foot injury.

The deputy commissioner also concluded Buchanan sustained sixty-five percent industrial disability as a result of her ankle and back problems, based in part on a vocational evaluation Buchanan underwent on May 19, 2016. After reviewing Buchanan's medical and employment history the evaluator concluded Buchanan's lifting and prolonged walking limitations "result[] in a total 64.2% loss of access to the labor market due to her work related injuries."

The deputy commissioner also found Mill Pond and Zurich unreasonably denied workers' compensation benefits in violation of Iowa Code section 86.13 (2016).

> In this case, the claim was denied benefits in a letter to claimant dated November 24, 2014 on the basis of defendants' investigation and claimant's failure to respond to Inquiries. The results of the investigation were not disclosed. Presumably, this was based on the views of the two initial physicians, Drs., Thiel and Gilarski. However, their own authorized physician, Dr. Bingham at that time clearly indicated he felt her problems were work related and defendant did not explain to claimant why they rejected his views. . . . Defendants assert a lack of causation issue, but there is no evidence of any further investigation until they requested an evaluation by Dr. Mooney December 2013.
>      I hold that the initial denial was unreasonable because it failed to comply with Iowa Code section 85.13 which requires that claimant be notified of the results of a supposed investigation. . . . However, the causation issue became fairly debatable after Dr. Mooney issued his views on August 26, 2015. Consequently, defendants unreasonably withheld benefits between the date of injury and August 26, 2015. . . . At any rate, continued reliance on the views of Drs. Thiel and Gilarski to deny the claim on causation was unreasonable after the MRI revealed a torn tendon and Dr. Plew provided a diagnosis of a torn tendon on December 15, 2014.

The deputy commissioner concluded Mill Pond and Zurich unreasonably withheld healing period benefits from October 30, 2014, until August 26, 2015, and assessed a penalty of $5428.97, half the maximum penalty for such violations.

14

Appellants appealed to the commissioner of workers' compensation, who affirmed the deputy commissioner's decision in its entirety. Appellants next sought judicial review. In a December 2018 ruling, the district court affirmed the commissioner's decision on medical causation and industrial disability, but it reversed the commissioner's decision to award penalty benefits.

> Although there was substantial evidence to support the Commission decision that the injury was work-related and specifically related to operation of the Hoyer lift, it was not unreasonable for Mill Pond to rely on Buchanan's own failure to identify or describe a work-related injury and Dr. Gilarski's medical records indicating that Buchanan stated the pain was not related to an injury or work activity. The fact that later medical providers relied on Buchanan's more recent descriptions does not mean the issue was not fairly debatable or that Mill Pond's position was unreasonable.

Both parties appeal the district court's ruling.

## II. Standard of Review

"Judicial review of workers' compensation cases is governed by Iowa Code chapter 17A. On our review, we determine whether we arrive at the same conclusion as the district court." *Warren Props. v. Stewart*, 864 N.W.2d 307, 311 (Iowa 2015). "Medical causation presents a question of fact that is vested in the discretion of the workers' compensation commission." *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 844 (Iowa 2011). "We will therefore only disturb the commissioner's finding of medical causation if it is not supported by substantial evidence." *Id.* (citing Iowa Code § 17A.19(10)(f)). As used in chapter 17A,

> "Substantial evidence" means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the

consequences resulting from the establishment of that fact are understood to be serious and of great importance.

Iowa Code § 17A.19(10)(f)(1). But "the question on appeal is not whether the evidence supports a different finding than the finding made by the commissioner, but whether the evidence 'supports the findings actually made.'" *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 218 (Iowa 2007) (quoting *St. Luke's Hosp. v. Gray*, 604 N.W.2d 646, 649 (Iowa 2000)).

Whether Buchanan suffered a sixty-five percent industrial disability is a mixed question of law and fact. *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 525 (Iowa 2012). We review the commissioner's findings of fact for substantial evidence and we "must engage in a 'fairly intensive review of the record to ensure that the fact finding is itself reasonable.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Caselman*, 657 N.W.2d 493, 499 (Iowa 2003)). But "in considering findings of industrial disability, we recognize that the commissioner is routinely called upon to make such assessments and has a special expertise in the area that is entitled to respect by a reviewing court." *Id.* at 527. And insofar as the parties challenge the commissioner's application of law to facts, we will not reverse the commissioner unless his decision is "irrational, illogical, or wholly unjustifiable." *Larson Mfg. Co. v. Thorson*, 763 N.W.2d 842, 857 (Iowa 2009).

We review the commissioner's interpretation of Iowa Code section 86.13 for errors at law. *Pettengill v. Am. Blue Ribbon Holdings, LLC*, 875 N.W.2d 740, 745 (Iowa Ct. App. 2015); *see* Iowa Code § 17A.19(10)(c) ("The court shall reverse, modify, or grant other appropriate relief from agency action . . . if it determines that substantial rights of the person seeking judicial relief have been

prejudiced because the agency action is . . . [b]ased upon an erroneous interpretation of a provision of law whose interpretation has not clearly been vested by a provision of law in the discretion of the agency.").

## III. Discussion

### a. Medical Causation

Mill Pond and Zurich first argue the determination that Buchanan's ankle and sequela back injury were caused by and arose out of Buchanan's employment at Mill Pond was not supported by substantial evidence. For the reasons below, we disagree.

In regard to the ankle injury, Mill Pond and Zurich base their argument mainly on inconsistencies in the medical records and Buchanan's recollection of the injury to suggest the injury did not occur on February 2, 2014, while Buchanan was working for Mill Pond. These inconsistencies, appellants argue, undercut the commissioner's reliance on the medical opinions and diagnoses of Drs. Bingham and Albrecht rather than the opinions of Drs. Thiel, Gilarski, and Mooney. *See Pease*, 807 N.W.2d at 845 ("The weight given to expert testimony depends on the 'accuracy of the facts relied upon by the expert and other surrounding circumstances.'" (quoting *Schutjer v. Algona Manor Care Ctr.*, 780 N.W.2d 549, 560 (Iowa 2010))). "Ultimately, however, the determination of whether to accept or reject an expert opinion is within the 'peculiar province' of the commissioner." *Id.* (quoting *Deaver v. Armstrong Rubber Co.*, 170 N.W.2d 455, 464 (Iowa 1969)). "In addition, we give due regard to the commissioner's discretion to accept or reject testimony based on his assessment of witness credibility." *Schutjer*, 780 N.W.2d at 858.

Essentially, appellants ask us to find Buchanan's inconsistent statements to medical professionals "so impossible or absurd and self-contradictory that [they] should be deemed a nullity by the court." *Graham v. Chi. & Nw. Ry.*, 119 N.W. 708, 744 (Iowa 1909). This we cannot do. The deputy commissioner noted Buchanan's inconsistent statements to medical professionals and concluded Buchanan's initial uncertainty was explained by her reliance on Dr. Thiel's assessment that she had plantar faciitis. Dr. Thiel's notes, however, state Buchanan informed him the pain started about two months before her meeting with him in late March 2014, which places the initial injury sometime in February 2014. The deputy commissioner further concluded Buchanan credibly testified that Dr. Gilarski's notes—including his assessment that her pain had only started in or around the last week as of their June 4 appointment—did not accurately reflect the substance of his conversation with her. As the district court noted in its order on judicial review, "This is not a situation where the Commission failed to consider important facts, instead those facts were weighed and interpreted differently than Mill Pond argues they should be." The deputy commissioner evaluated the conflicting medical evaluations and concluded the opinions of Drs. Bingham, Plew, Albrecht, and Bansal correctly identified Buchanan's injury as work-related. The deputy commissioner determined Dr. Gilarski's opinion was unpersuasive because it "was inconsistent with the notes of Dr. Thiel and claimant's credible testimony." The deputy commissioner similarly discounted Dr. Mooney's independent medical examination because Dr. Mooney relied mainly on the medical records from Dr. Thiel and Dr. Gilarski, who both incorrectly diagnosed Buchanan's injury. The commissioner affirmed the deputy

commissioner's decision in its entirety. We cannot say the deputy commissioner's finding of medical causation as related to Buchanan's ankle injury was unsupported by substantial evidence.

We reach the same conclusion for Mill Pond and Zurich's challenge to the commissioner's causation determination related to the alleged sequela injury to Buchanan's back. Mill Pond and Zurich do not dispute that the only two physicians who address Buchanan's back injury, Dr. Mooney and Dr. Bansal, agreed an ankle injury could lead to her lower back injury. The commissioner noted this agreement. Dr. Bansal further opined Buchanan's back injury was permanent because "the reason for her back pain is her altered gait, and the altered gait is the result of a permanent ankle condition, it stands to reason that the back pain would be permanent." We similarly cannot conclude the commissioner's medical causation determination in regard to Buchanan's back injury was not supported by substantial evidence.

### b. Industrial Disability

Mill Pond and Zurich next argue the commissioner's determination that Buchanan had an industrial disability rating of sixty-five percent is not supported by substantial evidence. In particular, appellants argue Buchanan has failed to establish that her injuries were permanent and the sixty-five percent industrial disability rating is "grossly inflated and not reflective of agency precedent."

An employee who experiences a permanent disability is entitled to compensation. Iowa Code § 85.34. The amount of compensation "is based on the employee's earning capacity." *Neal*, 814 N.W.2d at 526. Earning capacity is in turn determined "by an evaluation of several factors, including 'functional

disability . . . age, education, qualifications, experience, and inability to engage in similar employment.'" *Id.* (quoting *Swiss Colony, Inc. v. Deutmeyer*, 789 N.W.2d 129, 137–38 (Iowa 2010) (citation and internal quotation marks omitted)). The commissioner addressed all of these factors. Based on Dr. Albrecht and Dr. Bansal's evaluations, the commissioner found Buchanan had a seven percent whole body impairment from her ankle and sequela back injury. The commissioner further noted Buchanan was forty-four years old at the time of the hearing, had earned her associate's degree, and had obtained a CNA certificate. The deputy commissioner found, and the commissioner affirmed, the work restrictions imposed on Buchanan by Dr. Albrecht and Dr. Bansal limited her to sedentary work, which "prohibit[s her] from nursing assistant jobs, the occupation for which she is best suited." The commissioner's assessment of sixty-five percent disability is also supported by the undisputed findings of the vocational evaluation, which found Buchanan's injuries led to a "64.2% loss of access to the labor market." Given this evidence, we conclude substantial evidence supports the commissioner's determination and that determination is not irrational, illogical, or wholly unjustifiable.

### c. Penalty Benefits

Finally, Buchanan argues the district court erred by reversing the commissioner's award of penalty damages. The commissioner determined Mill Pond and Zurich unreasonably withheld healing period benefits from October 30, 2014 through August 26, 2015, when Dr. Mooney issued his independent medical evaluation disputing Buchanan's claims her ankle and back injuries were caused by her work for Mill Pond. On our review, we conclude the

commissioner's determination was not supported by substantial evidence and affirm the district court.

The district court found the commissioner's decision to award penalty benefits was not supported by substantial evidence in part because the commissioner incorrectly applied Iowa Code section 86.13. Iowa Code section 86.13 directs the commissioner to award penalty benefits if "(1) The employee has demonstrated a denial, delay in payment, or termination of benefits. (2) The employer has failed to prove a reasonable or probable cause or excuse for the denial, delay in payment, or termination of benefits." Iowa Code § 86.13(4)(b) (2016). Section 86.13 further requires a reasonable or probable cause or excuse for denial to meet all of the following requirements:

> (1)     The excuse was preceded by a reasonable investigation and evaluation by the employer or insurance carrier into whether benefits were owed to the employee.
> (2)     The results of the reasonable investigation and evaluation were the actual basis upon which the employer or insurance carrier contemporaneously relied to deny, delay payment of, or terminate benefits.
> (3)     The employer or insurance carrier contemporaneously conveyed the basis for the denial, delay in payment, or termination of benefits to the employee at the time of the denial, delay, or termination of benefits.

*Id.* § 86.13(4)(c). The deputy commissioner concluded, and the commissioner affirmed, section 86.13 "requires that claimant be notified of the results of a supposed investigation." The district court disagreed, stating "[t]he 'basis' for the denial must be conveyed and the basis must stem from an investigation, but the language of the statute does not require that the 'results of the investigation' be conveyed."

"When interpreting a statute, we look first to the statute's plain meaning." *Cox v. Iowa Dep't of Human Servs.*, 920 N.W.2d 545, 553 (Iowa 2018). If the meaning of a statute is unambiguous, "we will apply the statute as written." *Id.* We conclude section 86.13(4)(c)(3) is unambiguous. The term "basis" is generally defined as "[a] fundamental principle; an underlying fact or condition; a foundation or starting point." *Basis*, Black's Law Dictionary (11th ed. 2019). Thus, Mill Pond and Zurich did not have to provide the results of their investigation to Buchanan—just the reason for their denial of payments, which Zurich's November 24 letter does by informing Buchanan Zurich believed "the problem with your left heel/foot is not related to an incident at work." Thus, the commissioner's conclusion that Mill Pond and Zurich's initial denial of Buchanan's claim was unreasonable was not supported by substantial evidence.

The question then becomes whether the denial of Buchanan's claim was unreasonable between December 15, 2014, and August 26, 2015, after Buchanan's MRI showed Dr. Thiel and Dr. Gilarski's diagnoses were incorrect but before Dr. Mooney disputed Dr. Albrecht and Dr. Bansal's medical causation determinations. "A reasonable basis for denying insurance benefits exists if the claim is 'fairly debatable' as to either a matter of fact or law." *Thornton v. Am. Interstate Ins. Co.*, 897 N.W.2d 445, 465 (Iowa 2017) (quoting *Rodda v. Vermeer Mfg.*, 734 N.W.2d 480, 483 (Iowa 2007)). "A claim is 'fairly debatable' when it is open to dispute on any logical basis." *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 472 (Iowa 2005). "Stated another way, if reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable." *Id.*

The deputy commissioner concluded, and the commissioner affirmed, "any reliance on the views of Drs. Thiel and Gilarski to deny the claim on causation was unreasonable after the MRI revealed a torn tendon and Dr. Plew provided a diagnosis of a torn tendon on December 15, 2014, rendering any prior diagnosis invalid." But as the district court noted the commissioner's "decision conflates two concepts: what physical problem was causing pain with whether the underlying physical problem was work related." The MRI established Buchanan had a tear in the peroneus longus tendon of her left ankle—it does not establish when or how Buchanan was injured. While the commissioner concluded Dr. Thiel and Dr. Gilarski's assessments were not correct, that conclusion "does not negate the existence of a genuine dispute with respect to whether" Buchanan's use of the Hoyer lift at work on February 2, 2014, was the cause of her ankle injury. *City of Madrid v. Blasnitz*, 742 N.W.2d 77, 83 (Iowa 2007); *see also Bellville*, 702 N.W.2d at 473 ("As one court has explained, '[c]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to justify denial of the claim.'" (quoting *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 285 (Tex. Ct. App. 1992)). We conclude the commissioner's finding that Mill Pond and Zurich unreasonably withheld payments from December 15, 2014, through August 26, 2015, is not supported by substantial evidence.

## IV. Conclusion

In regard to Mill Pond and Zurich's medical causation and industrial disability arguments, we conclude the commissioner's findings are supported by substantial evidence and its application of the law to facts was not irrational,

illogical, or wholly unjustifiable. The district court correctly reversed the commissioner's determination that appellants unreasonably withheld healing period payments.

**AFFIRMED.**